**Joseph MAZZEI, on behalf of himself and all others similarly situated Plaintiff(s),**

v.

**The MONEY STORE and TMS MORTGAGE, INC., Defendant(s).**

**No. 01 CIV.5694(JES).**

United States District Court, S.D. New York.

Dec. 1, 2004.

As Amended Dec. 3, 2004.

The Law Offices of Mark S. Kaufman, Attorney for Plaintiff, New York, Mark S. Kaufman, Esq., of Counsel.

Paul Grobman, Esq., Attorney for Plaintiff, New York, Law Offices of Curtis V. Trinko, P.C., Attorneys for Plaintiff, New York, Curtis V. Trinko, Esq., Neal A. Deyoung, Esq., of Counsel.

Pollack & Kaminsky, Attorneys for Defendants, New York, Martin I. Kaminsky, Esq., W. Hans Kobelt, Esq., of Counsel.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff Joseph Mazzei brings the above-captioned action on behalf of himself and all others similarly situated against defendants The Money Store and TMS Mortgage, Inc.[1] (collectively "The Money Store") alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), the Truth In Lending Act ("TILA"), the Real Estate Settlement Procedures Act ("RESPA"), and various pendent state law claims in conjunction with defendants' alleged debt collection practices. Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56(a). For the reasons that follow, defendants' motion for summary

judgment is granted in part and denied in part.

## BACKGROUND

### FDCPA Background

Unless otherwise noted, the following facts are uncontested. In November 1994, plaintiff took out a mortgage loan from The Money Store on a property in Sacramento, California. *See* Second Amended Complaint ("Compl.") ¶ 13. Beginning in the winter of 1998 plaintiff was periodically delinquent on his loan, and defaulted in or about December 1999. *See* Compl. ¶ 20; Plaintiff's 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s St.") ¶ 2. On or about February 25, 2000, plaintiff received a standardized debt collection letter on the letterhead of law firm Moss, Codilis, Stawiarski, Morris, Schneider & Prior LLP ("Moss Codilis") complete with their Colorado office address, phone and fax numbers on the bottom.[2] *See* Plaintiff's Declaration in Opposition to Defendants' Motion for Summary Judgment, dated June 9, 2003 ("Pl.'s Declar."), Declaration of Mark S. Kaufman, dated June 9, 2003 ("Kaufman Declar.") ¶ 5; Pl.'s Declar., Exhibit ("Ex.") A; Compl. ¶ 21. Moss Codilis is a self proclaimed "debt collector." Defendants' 56.1 Statement in Support of Its Motion for Summary Judgment ("Defs.' St.") ¶ 10. The pertinent portions of the February 23, 2000 letter read as follows:

Dear Joseph Mazzei:

This firm has been retained by the Servicer, (TMS Mortgage Inc.) and authorized by the Creditor of the above-referenced home loan (hereinafter referred to

---

1. TMS Mortgage, Inc. is a subsidiary of The Money Store. *See* Second Amended Complaint ¶ 7. The Money Store is apparently now known as HomEq Inc. *See* The Money Store's Rule 56.1 Statement ¶ 2.

2. Plaintiff received four form letters in total from Moss Codilis, all very similar in content and wording. *See* Pl.'s Declar., Kaufman Declar., ¶ 5; Pl.'s Declar., Ex. A.

as "the Debt") to contact you regarding the status of your account.... You are hereby provided formal notice that you are in default...for failure to pay the required installments when due. This letter serves as further notice that TMS Mortgage Inc. intends to enforce the provisions of the Note and Security Instrument. You must pay the full amount of the default on this loan by the thirtieth (30th) day from the date of this letter....This law firm is attempting to collect a debt for our client, and any information obtained will be used for that purpose....**All communication about this matter must be made through TMS Mortgage Inc.** except those specified in this letter. **TMS Mortgage Inc.'s phone number is (800)795–5125.** TMS Mortgage Inc. requires that all payments must be...mailed to **TMS Mortgage Inc. at Post Office Box 96053, Charlotte, NC 28296–0053**.... Very truly yours, MOSS, CODILIS, STAWIARSKI, MORRIS, SCHNEIDER & PRIOR, LLP

See Pl.'s Declar., Ex. A. Plaintiff claims that, through this breach letter, "the Money Store Defendants sought to convey the false impression that independent debt collectors were attempting to collect on its behalf, when in reality it was attempting to collect its own debts." Compl. ¶ 26.

The breach letter was sent pursuant to an agreement between Moss Codilis and defendants (the "Letter of Agreement") whereby Moss Codilis issued thirty day breach letters after receiving a spreadsheet from defendants detailing the various loans in default. See Pl.'s St. ¶ 4, Defs.' St. ¶ 14. Moss Codilis acted only in the pre-acceleration phase of the collection effort. See Pl.'s Declar., Kaufman Declar.

¶ 11; Defs.' St. ¶ 12. The specific relevant provisions of the Letter of Agreement are as follows:

1. TMS Mortgage Inc. desires to have Moss, et al facilitate the issuance of thirty (30) day breach letters by periodically taking delivery of an ACCESS spreadsheet....Moss, et al will generate the thirty (30) day breach letters based on information provided within the ACCESS spreadsheet....Moss, et al will perform the necessary duties to prepare for attorney signature and send via certified and first class U.S. Mail the aforementioned letters within a twenty-four (24) hour period of time upon receipt of accurate and complete data from TMS Mortgage Inc. essential to the breach letter program. TMS Mortgage Inc. reserves the right to initially and from time to time review and approve sample forms of the breach letters as forwarded to the borrowers. Review and approval of the breach letters by TMS Mortgage Inc. shall be based on the format of the breach letter only.

2. Moss, et al will charge fifty dollars ($50.00) for each breach letter generated....

4. TMS Mortgage Inc. agrees to provide Moss, et al with access to books, records, databases, investor guidelines, and files necessary for the completion of the contract duties....

10. Notifications will be addressed as follows:

In the case of Moss, et al: Moss, et al...Englewood, CO 80112....In the case of TMS Mortgage Inc: The Money Store...Sacramento, CA 95821....

Pl.'s Declar., Ex. C, Letter of Agreement. The Moss Codilis employee who oversaw the Breach Letter program, Christina Nash,[3] estimated that she received around

---

**3.** Plaintiff argues that Moss Codilis employee

Nash, the attorney responsible for overseeing

a hundred phone calls from borrowers during the Breach Letter program and probably 400 pieces of correspondence at her Moss Codilis location during her time supervising. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, dated June 9, 2003 ("Pl.'s Mem."), at 15; Pl.'s Declar., Ex. G, Deposition of Christina Nash ("Nash Dep.") at 186–87. Nash also testified to

> 'instances' during 3½ years of the Breach Letter program when Moss Codilis decided not to send out a breach letter despite Money Store's request to send the letter. (*See* Kaufman Ex. G., at 87–88.) However, Nash also admitted that she had 'absolutely no recollection as to how many times' this occurred (Kaufman Ex. G, at 89, 241), and neither Moss Codilis nor Money Store produced any documents confirming a single such instance.

Pl.'s St. ¶ 20; *see also* Defs.' St. ¶ 15.

In October 2000, approximately eight months after receiving the aforementioned breach letter, plaintiff sold his house and used the proceeds to pay off in full the then-posted balance on his loan. Compl. ¶ 30; Defs.' St. ¶ 24; *see* Pl.'s Declar., Ex. U. Defendants contend that plaintiff's defaults caused him to incur additional charges that had not yet been posted to his account at the time of this pay-off, "resulting in a continuing debit balance" even after plaintiff's pay-off. Defs.' St. ¶ 25.

**TILA Claim**

In order to receive a loan from The Money Store plaintiff executed certain loan documents. Pl.'s St. ¶ 62. These documents permitted a ten dollar fee to be charged against the borrower for any payment that was subsequently dishonored by the borrower's bank. Pl.'s St. ¶ 63. When plaintiff bounced a check, however, The Money Store imposed a fifteen dollar fee instead of the ten dollar amount permitted. *See* Pl.'s St. ¶ 65. In a letter to plaintiff dated February 27, 2001, The Money Store admitted that the fee should have been ten dollars and promised to refund the overpayment of five dollars. Pl.'s St. ¶ 71; Defs.' St. 29. Plaintiff claims the five dollars was never refunded. Pl.'s St. ¶ 72. Defendants disagree, claiming that the overpayment was applied to plaintiff's unpaid corporate advances. Defs.' St. ¶ 57; Pl.'s St. ¶ 73.

Plaintiff also claims that there was not a legitimate debit balance in his account because The Money Store debited his account for "Attorney Outsourcing Fees" and "Unpaid Other Fees" which it had no right to collect. Pl.'s Mem. at 21. Specifically plaintiff claims defendants improperly charged him $140.00 in attorney's fees for the four breach letters, $133.55 for five months of late charges, $50.00 for the preparation of the payoff quote, $125.00 in attorneys fees for a bankruptcy proof of claim, $190.00 to post the notice of sale on Mazzei's door, $100.00 for a broker price opinion, $17.00 for property inspections and $13.00 for a substitution of trustee. Pl.'s St. ¶¶ 75, 76.

Defendants, on the other hand, contend that plaintiff's account never had a credit balance in excess of $1 as required by TILA. Defs.' St. ¶ 57. Even after plaintiff

---

the breach letter program, was not authorized to practice law, *see* Pl.'s Mem. at 6–7, that Moss Codilis made no professional judgment as to the validity or delinquency of the debt, *see* Pl.'s Mem. at 2, 9–10, and did not exercise professional judgment, *see* Pl.'s Mem. at 10–

13. However, given that Moss Codilis is not a defendant in this action, the Court need not determine the propriety of its conduct, and such considerations therefore are largely irrelevant.

sold his house in October 2000 and used the proceeds to pay off the then-posted balance of his loan, defendants contend that plaintiff had incurred additional charges that had not yet been posted to his account, and that he therefore had "a continuing debit balance in his account." Defs.' St. ¶¶ 24–25. Defendants also contend that in a February 27, 2001 letter to plaintiff, The Money Store explained that, even after plaintiff had paid off his loan, his account had a deficit debit balance of $39.26, which was written off. Defs.' St. ¶ 30.

## RESPA

Three months after plaintiff paid off his loan, he wrote a letter to defendants, dated January 16, 2001, in which he requested certain information. The pertinent portions of plaintiff's letter read as follows:

Dear Sirs:

In connection with the above-referenced loan, under which I was the borrower, I request the following information from The Money Store:

1. A copy of any documents distributed to or signed by me relating to the Automatic Payment Plan....

2. An explaination [sic] for the $15.00 NSF charge on the October 2, 2000 payoff statement. (My original note limits such fees to $10.00);

3. An explaination [sic] of your right to collect (and itemized breakdown of) "the expenses of collection and attorney's fees and cost" referred to in the February 23, 2000 letter providing me with formal notice of default.

4. An explaination [sic] of your right to collect (and an itemized breakdown of[ ] the "Attorney Outsourcing Fees" and "Unpaid Other Fees" referred to in the October 2, 2000 Payoff Letter.

Please send such information to me....

Defendants' Notice of Motion for Summary Judgment ("Defs.' Notice of Motion"), Ex. P. The Money Store sent a letter in reply dated February 2, 2001 acknowledging plaintiff's "recent inquiry." Defs.' Notice of Motion, Ex. Q.

In a follow-up letter dated February 27, 2001, The Money Store provided plaintiff with another more detailed response, which largely addressed plaintiff's earlier requests:

Dear Mr. Mazzei:

Thank you for your recent inquiry....Please refer to the enclosed copy of your correspondence regarding the information provided below:

1. Per your request, enclosed is a copy of your signed agreement with The Money Store relating to the Automatic Payment Plan (APP).

2. The returned-draft fee to which your correspondence refers originated with your APP payment dated September 6, 1999, in the amount of $535.16. Please note, having reviewed your signed Note, we concur that the returned-draft fee should have been assessed at $10.00. Consequently your overpayment of $5.00 will be refunded to you. Please allow 7–10 business days to receive it.

3. Having completed the research associated with your inquiry, we have confirmed that the Corporate Advances on your loan, in the amount of $2,458.07, are valid. The following is a summary of the items paid on your behalf due to the status of your loan.

- 4 Breach/Notice of Default Letters (3/98,5/98,11/98,2/00) $ 140.00
- 3 Broker Price Opinions (12/98,2/00,6/00) $ 300.00
- 5 Property Inspections (10/99,1/00,3/00,5/00,6/00) $ 42.50
- Delinquent Property Taxes 1999–2000 (3/00) $ 416.30
- Bankruptcy Attorney/Court Costs (7/00,10/00,11/00) $ 260.00
- Foreclosure Attorney/Court Costs (12/00) $1,299.27

To date, a total of $2,418.81 has been paid toward Corporate Advances. The

remaining balance of $39.26 has been written-off as uncollectible. Regarding the right of The Money Store to assess, and collect Corporate Advances, we refer you to section 4, paragraph D, of your signed Note entitled Payment of Note Holder's Costs and Expenses.

4. The "other fees" listed on your Payoff Statement originated with the following:

- Demand Fee (10/00) $ 50.00
- Loan Cancellation Fee (10/00) $ 55.00

Please note, *Section 2943* of the *Civil Code of California* provides for the assessment of demand fees associated with the cost of furnishing a statement of obligation or Payoff Statement. Additionally, it provides for the assessment of recording and cancellation fees associated with the processing of lien release documents at a loan's payoff.

Mr. Mazzei, we trust this addresses your concerns. Should you have any questions, please contact our Customer Service Department at (877)867–7378....

Defs.' Notice of Motion, Ex. R. Defendants claim they credited plaintiff's account for the $5.00 overcharge the next day, while plaintiff says a refund was never made. *See* The Money Store's Memorandum in Support of Motion for Summary Judgment ("Defs.' Mem.") at 21; Pl.'s Mem. at 21.

## DISCUSSION

A court may grant summary judgment only if it determines that there are no genuine issues of material fact based on a review of the pleadings, depositions, answers to interrogatories, admissions on file and affidavits. *See* Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this burden, the nonmoving party then must come forward with specific facts showing that there is a genuine issue of material fact. Fed.R.Civ.P. 56(e). In doing so the nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible," *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir.1993).

When ruling on a summary judgment motion, a court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no genuine issue as to any material fact exists, the nonmoving party is entitled to summary judgment as a matter of law. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

## A. FDCPA Claim

Congress enacted the FDCPA in 1977 to "eliminate abusive debt collection practices by debt collectors, [and] to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged...." 15 U.S.C. § 1692(e). The FDCPA distinguishes between creditors and debt collectors, making clear that creditors are generally not considered to be debt collectors unless the debt collector is in reality the creditor's alter ego. *See* 15 U.S.C. § 1692a(6); 15 U.S.C. § 1692a(6)(F).

Plaintiff specifically alleges that the February 23, 2000 debt collection letter violated FDCPA § 1692f(1), § 1692e(2), § 1692e(5) and § 1692e(3). *See* Compl. ¶¶ 38, 39. Plaintiff's claims are premised on the assumption that defendants qualify as a debt collector under the FDCPA. Plaintiff argues that law firm and debt collector Moss Codilis exercised no legal judgment in generating the breach letters

sent to plaintiff as well as to thousands of others, thereby rendering creditor The Money Store the true debt collector under the false name exception contained in the FDCPA. *See* Pl.'s Mem. at 4–5.

Defendants contend that Moss Codilis attorney Christina Nash made legal determinations on The Money Store's behalf before sending any breach letter, but that, regardless, The Money Store is not a debt collector within the meaning of the FDCPA. *See* Defs.' Mem. at 6–8. Because the Court finds that The Money Store is not a debt collector within the meaning of the FDCPA, the Court grants defendants' motion for summary judgment on this claim.

### 1. The FDCPA False Name Exception

The FDCPA's definition of "debt collector" is found at 15 U.S.C. § 1692a(6):

> The term 'debt collector' means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

The Money Store's principal purpose is undisputedly not to collect debts; rather, The Money Store is a creditor, fitting well within the FDCPA definition of the term as an entity that "extends credit creating a debt or to whom a debt is owed...." 15 U.S.C. § 1692a(4). Moss Codilis, a nonparty in this case, on the other hand, is a self-espoused debt collector. *See* Defs.' Notice of Motion, Ex. C, Nash Dep. at 84–85, 172–73.[4]

 Creditors are generally not considered debt collectors under the FDCPA.

*See* 15 U.S.C. § 1692a(6)(F). Such a rule makes sense given that creditors already have a strong incentive to refrain from badgering their customers about overdue debts. *See* S. REP. NO. 95–382, at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696. Nonetheless, plaintiff contends that The Money Store is a debt collector within an exception embodied at 15 U.S.C. § 1692a(6):

> [T]he term [debt collector] includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts.

This false name exception aims to prevent deceit as to who is actually collecting the debt. *See Maguire v. Citicorp Retail Services, Inc.*, 147 F.3d 232, 236 (2d Cir.1998).

The leading Second Circuit authority on the false name exception is found in *Maguire v. Citicorp Retail Services, Inc.* The plaintiff in *Maguire* sued his creditor, Citicorp, arguing Citicorp should be considered a debt collector under the false name exception. *See id.* at 236. The facts revealed that Citicorp had a unit of its own company send out breach letters under the name Debtor Assistance to plaintiff and other customers in default. *See id.* at 234–35. Creditor Citicorp bore all the cost of transmitting the breach letters and the phone number referred to in the breach letter was one issued to and paid for by Citicorp. *See id.* at 235. The Second Circuit wrote,

> [a]s a general matter, creditors are not subject to the FDCPA. However, a creditor becomes subject to the FDCPA if the creditor 'in the process of collecting his own debts, uses any name other than his own which would indicate that a

---

**4.** Plaintiff notes that the deposition of Christina Nash is unsigned. Pl.'s Mem. at 3.

The Court recognizes, but will excuse defendants' oversight.

third person is collecting or attempting to collect such debts.' 15 U.S.C. § 1692a(6). A creditor uses a name other than its own when it uses a name that implies that a third party is involved in collecting its debts, 'pretends to be someone else' or 'uses a pseudonym or alias.'

*Id.* (quoting *Villarreal v. Snow*, No. 95–2484, 1996 WL 473386, at *3 (N.D.Ill. Aug.19, 1996)).

The Court then focused on the question whether, "under the least sophisticated consumer standard, a consumer would be deceived into believing that the letter at issue was not from Citicorp, but was from an unrelated third party, Debtor Assistance" given the relationship between Debtor Assistance and Citicorp. *Id.* at 236. The Court concluded that there was "considerable evidentiary support for the ... view that a 'least sophisticated consumer' could be misled into believing that the letter had been written by a third party attempting to collect debt and that

Citicorp had used a name other than its own toward that end," and that, therefore, it was error for the district court to have granted summary judgment to Citicorp. *Id.* at 237–38.[5]

■ The primary question before this Court is whether The Money Store fits within the false name exception as set forth in the FDCPA and construed by *Maguire.* A creditor may be deemed a debt collector under the false name exception if, "in the process of collecting his own debts, [the creditor] uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts," 15 U.S.C. § 1692a(6), if it "pretends to be someone else" or uses "a pseudonym or alias," *Maguire,* 147 F.3d at 235 (quoting *Villarreal v. Snow*, No. 95–2484, 1996 WL 473386, at *3 (N.D.Ill. Aug.19, 1996)), or if it owns and controls the debt collector, rendering it the creditor's alter ego. *See Maguire,* 147 F.3d at 234–35, 236.[6] "The triggering of the

---

**5.** In the instant case, plaintiff urges the Court to rely on an alternative line of cases, both of which include the law firm debt collector as a defendant and focus on the degree of attorney involvement by such law firms. *See Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 301, 307 (2d Cir.2003) (determining that "some degree of attorney involvement is required before a letter will be considered 'from an attorney' within the meaning of the FDCPA" and holding that "by relying on the attorneys' affidavits and not allowing plaintiff any opportunity to investigate precisely what information the affiants reviewed, how much time was spent reviewing plaintiff's file, and whether any legal judgment was involved with the decision to send the letters and ultimately to initiate litigation...the grant of summary judgment...was premature"); *Clomon v. Jackson,* 988 F.2d 1314, 1322 (2d Cir.1993) (stating that an attorney has an "obligation to make *some* determination about a debtor's account prior to the issuance of a collection letter...."). Neither case involved the FDCPA false name exception. Indeed, these cases dealt with whether the *attor-*

*ney* was a debt collector, an issue not disputed here, not whether the creditor was a debt collector.

In apparent recognition of the key factual differences in *Miller* and *Clomon,* plaintiff next urges the Court to follow the Seventh Circuit in *Nielsen v. Dickerson,* 307 F.3d 623, 634–35, 639 (7th Cir.2002) (finding that the law firm was not "genuinely involved in the effort to collect [the creditor's] debts," that the letter was then not truly from the law firm, and concluding that the creditor should be treated as the debt collector under the false name exception). *Nielsen* is inapplicable because, as opposed to this case, the plaintiffs in *Nielsen* sued the law firm collecting the debt.

**6.** The Court recognizes that the Eastern District of New York has additionally held, in *Sokolski v. Trans Union Corp.,* 53 F.Supp.2d 307, 312 (E.D.N.Y.1999), that "liability can arise under 15 U.S.C. § 1692a(6) from a creditor's participation in a prohibited arrangement known as 'flat rating.' " Plaintiff argues that the fact that Moss Codilis was paid a flat fee for each letter sent suggests that The Mon-

FDCPA does not depend on whether a third party is in fact involved in the collection of a debt, but rather whether a least sophisticated consumer would have the false impression that a third party was collecting the debt." *Maguire*, 147 F.3d at 236. Affording the plaintiff the benefit of all reasonable inferences in his favor, it is clear that the impression that a third party was the debt collector was clearly not false.

■ First, The Money Store has not used a name other than its own. Rather, The Money Store hired Moss Codilis to send out debt collection letters, which Moss Codilis did under its own name. Pl.'s St. ¶¶ 2, 3, 4; Defs.' St. ¶¶ 9, 17, 21.

Nor did The Money Store pretend to be Moss Codilis, or use an alias to that effect. It is undisputed that Moss Codilis is a real entity that existed and performed work for The Money Store. *See* Pl.'s St. ¶¶ 4, 5, 8, 9. More specifically, it is not disputed that Moss Codilis received an ACCESS spreadsheet of information from defendants about the borrowers and debts owed, which its employees used to generate form

breach letters that The Money Store and Moss Codilis had jointly drafted; then, within twenty four hours of receiving the spreadsheet, Moss Codilis sent out the letters. *See* Pl.'s St. ¶¶ 19, 49; Pl.'s Mem. at 8, 14. While plaintiff alleges that Moss Codilis failed to act as a law firm should, he does not contest that Moss Codilis was a "pre-acceleration" servicing facility that generated breach letters for The Money Store. *See* Pl.'s St. ¶¶ 4, 5, 8.

Additionally, the relationship between The Money Store and Moss Codilis is not comparable to that found in *Maguire*. Moss Codilis is not "related" to The Money Store as the debt collector, Debtor Assistance, was to creditor Citicorp in *Maguire*. Debtor Assistance was part of the same economic entity as Citicorp, under its ownership and control. *See Maguire*, 147 F.3d at 234–36. Moss Codilis, on the other hand, is neither owned nor controlled by The Money Store. Moss Codilis is located in a different state than The Money Store, and has its own employees and facility with separate phone and fax numbers in

ey Store was buying the Moss Codilis attorney name instead of Moss Codilis' professional assistance. *See* Pl.'s Mem. at 16.

As of this time, the Second Circuit has not adopted this expansion of the false name exception. Indeed, looking at the statutory language of the provision of the FDCPA dealing with flat rating, 15 U.S.C. § 1692j, it "is silent as to the creditor's liability under a flat rating arrangement-assigning liability only to the party *furnishing* the form. . . ." *Sokolski*, 53 F.Supp.2d at 312. If Congress had intended to make creditors liable for participating in flat rating arrangements, it easily could have done so within this section; given that Congress has not done so, it seems problematic to impose such liability on creditors through the circuitous route of the false name exception.

In any event, the undisputed facts demonstrate that this is not a flat-rater case. A flat rater is someone who merely sells the creditor collection letters and is not actually involved

in the collection of the creditor's debts. *See Sokolski*, 53 F.Supp.2d at 312. While The Money Store did pay a flat fee for each letter Moss Codilis sent out, Moss Codilis was involved in some way in the collection effort, namely by receiving the ACCESS spreadsheet that included The Money Store borrowers' names and basic information *see* Pl.'s St. ¶ 35, and from it generating breach letters, and sending them out. *See* Pl.'s St. ¶¶ 19, 24–25; Defs.' St. ¶ 46. Plaintiff does not dispute that Moss Codilis jointly created the breach letters with The Money Store, that Moss Codilis performed administrative services for The Money Store, or that Moss Codilis played a minimal role in handling responses to the breach letters. *See* Pl.'s St. ¶¶ 49, 47, 52. While such conduct may not be sufficient to qualify as attorney involvement, a question not before this Court, it is enough to render this a non flat-rater case. *See Franceschi v. Mautner–Glick Corp.*, 22 F.Supp.2d 250, 256 (S.D.N.Y. 1998).

stark contrast to Debtor Assistance. *See* Pl.'s Declar., Ex. C, Letter of Agreement at 1, 2, 4; Compl. ¶¶ 6, 22; *see also Maguire,* 147 F.3d at 236.

Plaintiff does not dispute that, in the letters sent by Moss Codilis, plaintiff was told to contact defendants with questions, except those relating to issues specified in the debt collection letter, in which case Moss Codilis should be contacted, again demonstrating the separate nature of these two entities. *See* Pl.'s Mem. at 15. Moss Codilis employee Christina Nash estimated that she received around a hundred phone calls from borrowers during the Breach Letter program and probably 400 pieces of correspondence at her Moss Codilis location. Pl.'s Mem. at 15; Pl.'s Declar., Ex. G, Nash Dep. at 186–87. Moss Codilis also had other clients in addition to The Money Store for whom it did collection work. *See* Pl.'s Declar., Ex. G, Nash Dep. at 121–26; Defs.' Mem. at 2. In short, defendants and Moss Codilis are separate businesses, operating in their own independent financial interests, as exemplified by the Letter of Agreement into which the two separate entities entered. *See generally* Pl.'s Declar., Ex. C, Letter of Agreement.

Plaintiff's arguments that Moss Codilis attorney Christina Nash was not authorized to practice law, that the breach letters were not really from Moss Codilis in any meaningful sense, that Moss Codilis did not verify the validity of the debt or exercise any professional judgment in doing its work, played little role in handling responses to the breach letters, and did not take legal action to pursue The Money Store's debts, are not relevant to the question of whether The Money Store should be considered a debt collector under the false name exception of the FDCPA because they fail to demonstrate that Moss Codilis was The Money Store's alter ego.

Pl.'s Mem. at 6–7, 8–13, 15–16; *see Maguire,* 147 F.3d at 234–35, 236. There is no requirement in the FDCPA that debt collectors be attorneys and therefore, even if Moss Codilis failed to meet the relevant standard of attorney involvement, an issue not presented by the case before this Court, Moss Codilis would still be considered a debt collector under the FDCPA. At best plaintiff's arguments suggest Moss Codilis may have made a false misrepresentation that the breach letters were from an attorney, a claim plaintiff could and should have pursued against debt collector Moss Codilis directly, but which are not relevant here.

In sum, plaintiff does not sufficiently allege that The Money Store used Moss Codilis' name to collect its debts, pretended to be Moss Codilis or used an alias to that effect, or that The Money Store "controlled almost every aspect" of Moss Codilis' debt collection practice, rendering Moss Codilis defendants' alter ego. *See Harrison v. NBD Inc.,* 990 F.Supp. 179, 183 (E.D.N.Y.1998); *see also Maguire,* 147 F.3d at 234–36. For the aforementioned reasons, the Court concludes as a matter of law that The Money Store is not a debt collector and therefore grants defendants' motion for summary judgment on plaintiff's FDCPA claim.

## B. TILA and RESPA Claims

■ Plaintiff additionally asserts a claim under TILA, 15 U.S.C. § 1666d and 12 C.F.R. § 226.21, based on defendants' collection of a returned check fee in excess of that permitted by plaintiff's loan documents, and on defendants' charging for "Attorney Outsourcing Fees" and "Unpaid Other Fees," fees plaintiff says defendants had no right to collect, resulting in an alleged "credit balance" which defendants failed to refund. *See* Compl. ¶ 44; Pl.'s Mem. at 21. TILA § 1666d states:

Whenever a credit balance in excess of $1 is created in connection with a consumer credit transaction through (1) transmittal of funds to a creditor in excess of the total balance due on an account, (2) rebates of unearned finance charges or insurance premiums, or (3) amounts otherwise owed to or held for the benefit of an obligor, the creditor shall—

(A) credit the amount of the credit balance to the consumer's account;

(B) refund any part of the amount of the remaining credit balance, upon request of the consumer; and

(C) make a good faith effort to refund to the consumer . . . the amount of the credit balance remaining in the account for more than six months . . . .

Reg. 226.31 contains almost identical language.

Defendants argue that these provisions only apply to situations where there is a credit balance in excess of $1 in the debtor's account, and since there was never any credit balance in plaintiff's account at any time defendants' motion for summary judgment on this claim should be granted. However, defendants fail to calculate plaintiff's purported debit balance or provide materials from which this can be derived.[7]

Furthermore, defendants do not dispute that they collected a returned check fee from plaintiff in the amount of $15.00 when, pursuant to his loan documents, they were only allowed to collect $10.00. *See* Defs.' St. ¶ 29. Defendants claim that they subsequently refunded the $5.00 difference, while plaintiff says such a refund for that alleged "credit" was never provided. *See* Defs.' St. ¶ 57; Pl.'s St. ¶¶ 72, 73.

Discovery on the TILA claim has not yet occurred. Therefore the Court finds defendants' motion for summary judgment on plaintiff's TILA claim to be premature and denies it without prejudice subject to renewal upon completion of discovery.

■ Plaintiff also contends that The Money Store violated RESPA, 12 U.S.C. § 2605(e), by failing to respond to plaintiff's January 16, 2001 inquiry letter timely and properly. *See* Compl. ¶¶ 48, 49. Section 2605(e) requires a covered mortgagor in receipt of a qualified written request from its borrower for information on the servicing of its loan to send a written response acknowledging receipt of the correspondence within twenty days unless the mortgagor acts in accordance with the borrower's request within that time period. *See* 12 U.S.C. § 2605(e)(1)(A). Additionally, the mortgagor must, within sixty days, make the appropriate corrections in the borrower's account, or, after investigating, provide the borrower with a written response explaining why the account is correct or why the mortgagor cannot respond. *See* 12 U.S.C. § 2605(e)(2).

In his January 16, 2001 inquiry letter plaintiff requested an "explaination [sic] for the $15.00 NSF charge on the October 2, 2000 payoff statement." *See* Defs.' Notice of Motion, Ex. P. While defendants, in their February 27, 2001 response, admit they overcharged plaintiff by $5.00, the parties dispute whether or not a refund was subsequently made. *See* Defs.' St. ¶ 57; Pl.'s St. ¶¶ 72, 73.

Plaintiff also requested an explanation of The Money Store's right to collect and an itemized breakdown of the "Attorney Out-

---

7. Defendants submit in support of this claim an undecipherable Customer Account Activity Statement, Defs.' Notice of Motion, Ex. L, and a conclusory affidavit and letter, both of which basically state that plaintiff's account continued to have a debit balance. *See* Defs.' Notice of Motion, Affidavit of John Dunnery, dated May 2, 2003 ("Dunnery Aff.") at 49; Defs.' Notice of Motion, Ex. S.

sourcing Fees" and "Unpaid Other Fees" in his inquiry letter, fees also relevant to plaintiff's TILA claim. *See* Defs.' Notice of Motion, Ex. P.

Considering there is potential factual overlap between plaintiff's TILA and RESPA claims, at minimum with respect to whether defendants refunded the admitted $5.00 overcharge in compliance with RESPA, 12 U.S.C. § 2605(e)(2)(A), and possibly also with respect to the aforementioned "Attorney Outsourcing Fees" and "Unpaid Other Fees" defendants charged plaintiffs, the Court denies defendants' motion for summary judgment on plaintiff's RESPA claim, as well as plaintiff's state law claims, without prejudice subject to being renewed upon completion of discovery.

### CONCLUSION

For all of the aforementioned reasons, the Court grants defendants' Motion for Summary Judgment in part and denies it in part. The Court further finds that certification under Rule 54(b) of the Federal Rules of Civil Procedure is warranted. The only issue raised by an appeal pursuant to Rule 54(b) involves the Court's determination that The Money Store is not a debt collector within the meaning of the FDCPA, an issue unrelated to plaintiff's remaining claims. Since the Court finds that there is no just reason for delay in the appeal of this issue, the Court directs the Clerk of the Court to enter judgment dismissing plaintiff's FDCPA claim against defendants pursuant to Fed. R. Civ, P. 54(b).

With respect to plaintiff's remaining claims, discovery pertaining to plaintiff's TILA and RESPA claims shall be completed no later than ninety (90) days from the entry of this Opinion and Order. Discovery on plaintiff's remaining state law claims shall be and hereby is stayed. A Pre–Trial Conference in this action shall occur on March 28, 2005 at 3:00 p.m. in Courtroom 705, 40 Centre Street.

It is **SO ORDERED**.