Vincent v. The Money Store

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: November 8, 2012                    Decided: November 13, 2013)

Docket No. 11-4525-cv

_____

LORI JO VINCENT, RUTH ANN GUTIERREZ, LINDA U. GARRIDO, JOHN GARRIDO, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

JOSEPH MAZZEI,

*Plaintiff,*

—v.—

THE MONEY STORE, TMS MORTGAGE, INCORPORATED, HOMEQ SERVICING CORPORATION, MOSS, CODILIS, STAWIARSKI, MORRIS, SCHNEIDER & PRIOR, LLP,

*Defendants-Appellees.**

_____

_____

* The Clerk of the Court is directed to amend the caption of this case as set forth above.

1

Before:

KATZMANN, *Chief Judge*, LIVINGSTON, and LOHIER, *Circuit Judges*.

_____

Appeal from a judgment of the United States District Court for the Southern District of New York (Koeltl, *J.*), dismissing plaintiffs' claims under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* With respect to plaintiffs' FDCPA claims, we hold that where a creditor that is collecting its own debts hires a law firm to mail thousands of letters to debtors that misleadingly indicate that the law firm has been retained to collect the creditor's debts, and where the law firm has not engaged in any other *bona fide* efforts to collect those debts, the creditor can be held liable for violating the FDCPA pursuant to the statute's false name exception to creditor immunity. 15 U.S.C. § 1692a(6). Here, given the disputed issues of fact regarding the law firm's role in the collection process, we conclude that the district court erred in granting summary judgment in favor of defendants-appellees on plaintiffs' FDCPA claims. With respect to plaintiffs' TILA claims, we hold that because defendants were assignees of the plaintiffs' mortgages and were not the persons to whom the mortgages were initially payable as reflected on the face of the loan documents, the district court correctly concluded that the defendants were not "creditors" under TILA and cannot be held liable for violating its provisions. 15 U.S.C. § 1602(g). For the reasons stated below, the judgment of the district court is **AFFIRMED** in part, **VACATED** in part, and **REMANDED** for further proceedings consistent with this Opinion.

Chief Judge KATZMANN concurs in a separate opinion. Judge LIVINGSTON concurs in part and dissents in part in a separate opinion.

_____

PAUL S. GROBMAN (Neal DeYoung, Sharma & DeYoung LLP, *on the brief*), New York, NY, *for Plaintiffs-Appellants.*

DANIEL A. POLLACK (Edward T. McDermott, W. Hans Kobelt, *on the brief*), McCarter & English, LLP, New York, NY, *for*

*Defendants-Appellees The Money Store, TMS Mortgage, Inc., Homeq Servicing Corp.*

DAVID J. CHIZEWER, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, IL, *for Defendant-Appellee Moss, Codilis, Stawiarski, Morris, Schneider & Prior, LLP*.

_____

KATZMANN, *Chief Judge*:

This case requires us to determine if the consumer protections of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, apply to a mortgage lender that has purchased mortgages initially payable to other lenders and, after the homeowners defaulted on their mortgages, hired a law firm to send allegedly deceptive debt collection letters on its behalf. Plaintiffs-Appellants Lori Jo Vincent, Ruth Ann Gutierrez, Linda Garrido, and John Garrido (collectively, the "plaintiffs") appeal from a judgment of the United States District Court for the Southern District of New York (Koeltl, *J.*), which granted defendants' motion for summary judgment on plaintiffs' TILA claims and denied plaintiffs' motion for reconsideration of the district court's (Sprizzo, *J.*) earlier dismissal of their

FDCPA claims against Defendants-Appellees The Money Store, TMS Mortgage, Inc., and HomeEq Servicing Corp. (collectively, "The Money Store").

With respect to plaintiffs' FDCPA claims, although creditors are generally not considered debt collectors subject to the FDCPA, the statute contains an exception to creditor immunity where the creditor, "in the process of collecting [its] own debts, uses any name other than [its] own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6). Plaintiffs contend that The Money Store used the name of the law firm Moss, Codilis, Stawiarski, Morris, Schneider & Prior, LLP ("Moss Codilis") by hiring the law firm to send out collection letters that falsely indicated that Moss Codilis had been retained to collect the debts The Money Store was in fact collecting. The district court rejected that argument, finding that The Money Store had not used a name other than its own, and therefore could not be found liable for violating the FDCPA through the so-called false name exception.

Similarly, with respect to plaintiffs' TILA claims, the district court found that The Money Store could not be held liable under TILA for charging plaintiffs unauthorized fees on their accounts and failing to refund the resulting credit

4

balances.  TILA applies only to a "creditor," which is defined in the statute as the person to whom the debt is initially payable.  15 U.S.C. § 1602(g).[1]  Because The Money Store was an assignee of the plaintiffs' notes, and therefore not the person to whom the debts were initially payable, the district court determined that The Money Store did not qualify as a creditor under TILA.

For the reasons set forth below and resolving all factual disputes in plaintiffs' favor, we respectfully first hold that the district court erred in concluding that The Money Store was not a "debt collector" under the false name exception to FDCPA liability.  Where a creditor, in the process of collecting its own debts, hires a third party for the express purpose of representing to its debtors that the third party is collecting the creditor's debts, and the third party engages in no *bona fide* efforts to collect those debts, the false name exception exposes the creditor to FDCPA liability.  With respect to the TILA claims, however, we conclude that the district court correctly determined that, because plaintiffs' mortgage documents did not name The Money Store as the person to whom the debt was initially payable, The Money Store is not a "creditor" under

---

[1] The district court's decision refers to 15 U.S.C. § 1602(f).  Since then, subsection (f) has been recodified at subsection (g).

5

TILA and is therefore not subject to liability. Accordingly, we affirm the judgment of the district court in part, vacate in part, and remand the case for further proceedings consistent with this Opinion.

**BACKGROUND**

*I.     Factual Background*

The following facts are drawn from the record before the district court and are undisputed unless otherwise noted:

Plaintiffs-Appellants are homeowners who defaulted on their mortgages. The Money Store, a mortgage lender, serviced the loans on which plaintiffs defaulted.

A.     The Plaintiffs' Mortgages

Plaintiff Lori Jo Vincent took out a mortgage loan on her home in Carrollton, Texas on February 16, 1998. She executed a promissory note and a deed of trust with her lender, Accubanc Mortgage Corporation. In the promissory note Vincent agreed:

> In return for a loan that I have received, I promise to pay U.S. $67,600.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is ACCUBANC MORTGAGE CORPORATION. I understand that the Lender may transfer this Note.

6

J. App'x 851.  In addition, the deed of trust states:

> Borrower [Vincent] owes Lender [Accubanc] the principal sum of
> SIXTY-SEVEN THOUSAND SIX HUNDRED and NO/100 ----
> Dollars (U.S. $ 67,600.00).  This debt is evidenced by Borrower's note
> dated the same date as this Security Instrument ("Note"), which
> provides for monthly payments, with the full debt, if not paid
> earlier, due and payable on March 1, 2028. This Security Instrument
> secures to Lender [Accubanc]: (a) the repayment of the debt
> evidenced by the Note, with interest, and all renewals, extensions
> and modifications of the Note . . . .

J. App'x 857.  Neither the promissory note nor the deed of trust mentions The

Money Store.

At the time of the loan's execution on February 16, 1998, Accubanc gave

Vincent the disclosure statement required by TILA, 15 U.S.C. § 1631.[2]

Immediately after executing the mortgage, Accubanc transferred its interest in

the loan to EquiCredit Corporation of America by endorsing the promissory note

to EquiCredit.  Two-and-a-half months later, on April 30, 1998, EquiCredit

assigned and endorsed the note and deed of trust to The Money Store, which is

reflected on the note with a stamp that reads "Without Recourse Pay to the Order

---

[2] TILA requires creditors to disclose clearly certain terms of a mortgage,
including, *inter alia*, the annual percentage rate and finance charge.  *See* 15 U.S.C.
§ 1632; *see also* 15 U.S.C. § 1604; 12 C.F.R. §§ 226.17-20.

of TMS Mortgage Inc." Vincent's first loan payment was due on April 1, 1998, before the note had been assigned to The Money Store.

On April 5, 1997, plaintiff Ruth Gutierrez took out a mortgage loan on her home in Stockton, California. Gutierrez executed a note and deed of trust identifying the lender as First Financial Funding Group and using language very similar to the loan documents described above for Vincent's mortgage. Again, neither of these documents mentions The Money Store. At the time First Financial and Gutierrez executed the loan, First Financial also gave Gutierrez the TILA-required disclosure statement. Two days later, on April 7, 1997, First Financial assigned and endorsed the note and deed of trust to The Money Store. Gutierrez's first loan payment was due on May 10, 1997, meaning that Gutierrez's first payment, unlike Vincent's, was not due until after the loan had been assigned to The Money Store.

On May 22, 1996, plaintiffs Linda and John Garrido took out a $100,000 mortgage loan on their home in Huntington Station, New York. The promissory note they executed on that date again used language similar to the notes applicable to the other loan transactions, and listed FHB Funding Corporation as

their lender. The Garridoses additionally signed a mortgage that referenced the note and identified FHB Funding as the "Lender" and the Garridoses as the "Borrower." Once again, neither the note nor the mortgage mentions The Money Store. Like Vincent and Gutierrez, the Garridoses also received the TILA-required disclosure statement from FHB Funding at the time they executed the loan. Three weeks later, on June 13, 1996, FHB Funding assigned and endorsed the note and mortgage to The Money Store. The Garridoses' first loan payment was due on July 1, 1996, *i.e.*, two weeks after the loan had been assigned to The Money Store.

After the loans had been assigned to The Money Store, plaintiffs all eventually defaulted on their mortgages. They subsequently received letters from Moss Codilis informing them of their default. In addition, The Money Store allegedly charged plaintiffs improper fees on their accounts, including, *inter alia*: fees for multiple property inspections that did not occur; vague and unwarranted fees for "file reviews," "senior lien monitoring," and "Outsource Management Fees"; excessive late fees; surcharges for breach letters; attorneys' fees that were never paid out to attorneys; costs for purported motions in the bankruptcy court

9

that were never filed; and fees for other bankruptcy services that were in excess of what was contractually allowed.

### B. The Breach Letter Program

By agreement dated April 17, 1997, The Money Store contracted with Moss Codilis to prepare and mail breach notices to borrowers who, like plaintiffs, had defaulted on their loans. Such notices inform homeowners that they are in default and are generally a prerequisite before mortgage lenders like The Money Store can foreclose on a borrower's property. Labeled the "Breach Letter Program," Moss Codilis "generate[d] the thirty (30) day breach letters based on information provided [by The Money Store] within [a] . . . spreadsheet." J. App'x 336 (Letter of Agreement). In return, Moss Codilis received fifty dollars (later thirty-five dollars) for each breach letter generated. Outside of the Breach Letter Program, the firm performed no role in The Money Store's collection of its debts.

Moss Codilis promoted the Program to lenders as a means of leveraging its status as a law firm to encourage repayment of loans from borrowers in default. The promotional materials state:

> This program allows the client to send breach letters on attorney letterhead at a reasonable cost. Most of these costs are recovered through the reinstatement of the loans which is at a higher level as a

result of the impression which the attorney breach letter makes. . . .
It is . . . an excellent collection tool.

J. App'x 682.  At least one executive at The Money Store confirmed at his

deposition that the purpose of the Breach Letter Program was "to hopefully gain

the attention of the borrower, since it was coming from the law firm[]."  J. App'x

271-72 (deposition of John Dunnery, The Money Store Vice President).

The letters, which were printed on Moss Codilis letterhead, state that "this

law firm" has been "retained" in order to "collect a debt for our client," and that

the "this firm has been authorized by [The Money Store] to contact you" and

"provide[] notice that you are in default" on the mortgage.  J. App'x 652-56.  The

letters further state that if the default is not resolved within 30 days, then

> our client shall accelerate the entire sum of both principal and
> interest immediately due and payable, and invoke any and all
> remedies provided for in the Note and Security Instrument,
> including but not limited to the foreclosure sale of the property.

J. App'x 652.  Finally, the letters state that, with limited exceptions, "[a]ll

communication about this matter must be made through [The Money Store]."[3]  J.

---

[3] Specifically, the breach letters explain that the debtors could contact Moss
Codilis to: (1) dispute the debt in writing, at which point Moss Codilis
represented that it would obtain verification of the debt and mail it to the debtor;
(2) request the contact information for the original creditor; or (3) request in
writing that Moss Codilis refrain from contacting the debtor.

11

App'x 656. From 1997 up through 2002, Moss Codilis sent 88,937 letters on The Money Store's behalf, and thus received approximately between $3 and $4.5 million in fees.

Moss Codilis's work for The Money Store was supervised by Christina Nash and, after July 1999, Valerie Bromley, who assisted Ms. Nash in sending breach letters on The Money Store's behalf. According to Moss Codilis, one of its partners, Leo Stawiarski, bore primary responsibility for the legal aspects of the firm's work for The Money Store, and supervised Ms. Nash in all aspects, legal and non-legal, of her work. The breach letters were "jointly drafted" by Nash and The Money Store's legal department.

The parties disagree markedly as to the nature of the tasks that Moss Codilis performed for The Money Store. Each marshals evidence supporting its respective position. Although characterizing itself as a law firm, Moss Codilis describes the Breach Letter Program as an "exercise in mass processing" that involved little to no legal or otherwise independent judgment. In particular, Moss Codilis represented to the district court that "the only element of the Breach Letter Program that required legal analysis was the drafting of language for the

12

breach letter templates to ensure that they were in compliance with applicable state and federal laws." *Vincent v. Money Store* (*Vincent II*), No. 03 Civ. 2876 (JGK), 2011 WL 4501325, at *3 (S.D.N.Y. Sept. 29, 2011) (summarizing Moss Codilis's position).

For their part, plaintiffs assert that "Moss Codilis['s] role in the default process . . . began and ended with the mass generation of the breach letters." Appellants' Br. 12.  Plaintiffs further note:

> Apart from the breach letters themselves, Moss Codilis had no authority to initiate contact with debtors, no right to negotiate payment plans, no right to settle for any amount other than what Money Store said was in default, and no right to bring any legal action. If the breach letters sent out by Moss Codilis failed to elicit payment, it was Money Store — not Moss Codilis — who would then determine whether the matter should be referred out to their network of foreclosure counsel . . . .

*Id.* (citations and internal quotation marks omitted).  Moreover, plaintiffs point to Nash's deposition testimony where she stated that if a debtor contacted her with regard to "a legal matter," she "escalated" it by referring the matter to The Money Store instead of handling it herself.

In contrast to the foregoing, The Money Store contends that Moss Codilis did more than simply print and mail letters.  In addition to Moss Codilis's role in

13

reviewing the breach letters for their compliance with the FDCPA, The Money Store notes that Nash testified at her deposition that she was the primary drafter of the breach letters, with attorneys for The Money Store limited to "review[ing] [the letters] for format." Further, The Money Store points to Nash's deposition testimony that Moss Codilis conducted an independent review of the data on delinquent borrowers sent to it by The Money Store, and that "if there was questionable data, those loans were pulled and sent back to The Money Store." J. App'x 80–81 (testifying that questionable data includes things like "incomplete borrower information or incomplete address information," as well as data suggesting that the borrower was not actually in default on his or her loan obligations). Stressing Moss Codilis's independence, The Money Store asserts that when Moss Codilis disagreed with The Money Store's request to send a breach letter, Moss Codilis did not send out the letter.

The Money Store also notes that the breach letters invited debtors to contact Moss Codilis if they wished to verify the debt or the identity of their creditors. Pursuant to that invitation, Nash testified that she directly corresponded with The Money Store's debtors and their attorneys around one

14

hundred times. Nash testified that on occasion she corresponded with a debtor's bankruptcy counsel and attorneys at The Money Store with regard to a debtor's bankruptcy proceedings, as well as whether the debts in question had been discharged in bankruptcy. When legal action against a debtor was necessary, The Money Store claims that lawyers "affiliated with" Moss Codilis handled the legal proceedings through their own practices.

## II. Procedural History

On April 24, 2003, plaintiffs filed the instant action in the district court alleging that The Money Store had violated provisions of the FDCPA and TILA. Plaintiffs argued that the breach letters were unlawful under the FDCPA because they "creat[ed] the false impression that a third party had been hired to collect the debt" and "falsely impl[ied] that a law firm had been retained by the Money Store to collect the debt and was authorized to commence legal action against the borrower." With respect to their TILA claims, plaintiffs claimed that The Money Store had charged their accounts for fees and expenses which it had no right to collect, and had failed to refund the overcharges as required by TILA. Neither the FDCPA claims nor the TILA claims were asserted against Moss Codilis.

15

Separately, plaintiffs brought a number of claims against The Money Store and Moss Codilis under Colorado and California state law.

By Order dated December 7, 2005, the district court (Sprizzo, *J.*) granted summary judgment to The Money Store plaintiffs' FDCPA claims, relying on its prior decision in the separate, related case of *Mazzei v. Money Store*, 349 F. Supp. 2d 651, 661 (S.D.N.Y. 2004). *Vincent v. Money Store* ("*Vincent I*"), 402 F. Supp. 2d 501, 502–03 (S.D.N.Y. 2005).[4] In *Mazzei*, the district court found that plaintiffs could not rely on the false name exception because The Money Store had not "used" Moss Codilis's name. The district court reached this conclusion on the grounds that Moss Codilis, not The Money Store, sent out the breach letters, that The Money Store did not pretend to be Moss Codilis, and that The Money Store did not so thoroughly control Moss Codilis as to render Moss Codilis its "alter ego." *Mazzei*, 349 F. Supp. 2d at 661 (citing *Maguire v. Citicorp Retail Servs.*, 147 F.3d 232, 234–36 (2d Cir. 1998)). Accordingly, the district court concluded that The Money Store was not subject to FDCPA liability pursuant to the false name

---

[4] Based on the submission by both parties of discovery materials from the *Mazzei* case, the district court converted defendants' motion to dismiss into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–54 (2d Cir. 2002).

exception.  *Id.*  The court declined to dismiss plaintiffs' TILA claims, however, concluding that plaintiffs had adequately alleged that The Money Store had violated TILA by charging unauthorized fees and expenses and failing to refund the resulting credit balances on their accounts.  *Id.* at 662–63.

Following Judge Sprizzo's death this case was reassigned to Judge Koeltl on January 9, 2009.  The Money Store subsequently moved for summary judgment on plaintiffs' TILA claims, arguing that it was not a "creditor" as defined by the statute.  By Order dated September 29, 2011, the district court agreed and dismissed the TILA claims.  Noting that TILA defines a "creditor" as "the person to whom a debt is initially payable on the face of the indebtedness," 15 U.S.C. § 1602(g), the district court found that The Money Store did not fit within this definition because "[e]ach of the Notes identifies an entity other than The Money Store Defendants as the original lender and indicates an assignment to The Money Store Defendants."  The court also declined to exercise supplemental jurisdiction over plaintiffs' remaining state law claims, and denied plaintiffs' motion for reconsideration of the Judge Sprizzo's decision to grant defendants summary judgment on plaintiffs' FDCPA claims, concluding that the

17

subsequent declaration of Ms. Nash introduced by plaintiffs, where she explained that both she and Moss Codilis had a limited role in the Breach Letter Program, would not have altered Judge Sprizzo's decision.

Plaintiffs timely appealed the dismissal of their TILA and FDCPA claims against The Money Store.[5]

**DISCUSSION**

"We review a district court's grant of summary judgment *de novo*," *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002), and apply "the same standards applied by the district court," *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011). "Summary judgment may be granted only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). In determining whether there is a genuine dispute as to a material fact, we resolve all ambiguities and draw all inferences in favor of the non-moving party. *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012).

---

[5] Although plaintiffs initially appealed the dismissal of their state law claims against Moss Codilis, plaintiffs have since abandoned those claims, as plaintiffs' counsel represented at oral argument that Moss Codilis has dissolved and is no

*I.*     *FDCPA Liability*

We start with plaintiffs' FDCPA claims against The Money Store.

Congress enacted the FDCPA "to eliminate abusive debt collection practices by

debt collectors, to insure that those debt collectors who refrain from using

abusive debt collection practices are not competitively disadvantaged, and to

promote consistent State action to protect consumers against debt collection

abuses."  15 U.S.C. § 1692(e).  To further these ends, the FDCPA "establishes

certain rights for consumers whose debts are placed in the hands of professional

debt collectors for collection."  *DeSantis v. Computer Credit, Inc.*, 269 F.3d 159, 161

(2d Cir. 2001).  As is relevant here, section 1692e of the FDCPA provides

generally that "[a] debt collector may not use any false, deceptive, or misleading

representation or means in connection with the collection of any debt."  15 U.S.C.

§ 1692e.  In addition, "[w]ithout limiting the general application of the

foregoing," section 1692e proscribes sixteen specific debt collection practices,

including "[t]he false representation or implication that any individual is an

attorney or that any communication is from an attorney." *Id.* § 1692e(3).

---

longer doing business, rendering the prosecution of any such claims pointless.
Oral Arg. Tr. at 19.

19

Under our prior precedent, the plaintiffs have a triable claim that Moss Codilis's breach letters violated section 1692e's prohibition on the "use of false, deceptive, or misleading representation[s] . . . in connection with the collection of any debt." *See Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993).[6] Nonetheless,

---

[6] In determining whether language in a collection letter is "false, misleading, or deceptive" under section 1692e, we have held that courts must look to whether a reasonable "least sophisticated consumer" would be misled by it. *Clomon*, 988 F.2d at 1318. Here, the collection notices sent to plaintiffs are alleged to be deceptive because they falsely represented that an attorney, Moss Codilis, had been retained to collect The Money Store's debts. *See id.* at 1320. The facts here, construed in the light most favorable to plaintiffs, are nearly identical to *Clomon*. *See id.* at 1321 ("[T]here will be few, if any, cases in which a mass-produced collection letter bearing the facsimile of an attorney's signature will comply with the restrictions imposed by § 1692e."); *see also Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300–07 (2d Cir. 2003) (interpreting *Clomon* as requiring "meaningful attorney involvement" to avoid violating section 1692e, which is not satisfied where attorney is merely told by client that debt is owed).

In addition, although not asserted by plaintiffs, there would have likewise been a triable claim as to whether Moss Codilis violated 15 U.S.C. § 1692j, which prohibits:

> [T]he practice commonly known as "flat-rating," in which an individual sends a delinquency letter to the debtor portraying himself as a debt collector, when in fact he has no real involvement in the debt collection effort; in effect, the individual is lending his name to the creditor for its intimidation value, often in exchange for a "flat" rate per letter.

*Nielsen v. Dickerson*, 307 F.3d 623, 639 (7th Cir. 2002).

we must decide whether the plaintiffs may press this claim against The Money Store. They may do so only if The Money Store, "in the process of collecting [its] own debts," has "use[d] any name other than [its] own[, thereby] indicat[ing] that a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6). This provision of the statute is a departure from the general rule that creditors are not subject to the FDCPA. *Maguire v. Citicorp Retail Servs.*, 147 F.3d 232, 235 (2d Cir. 1998); *see also Mazzei*, 349 F. Supp. 2d at 658 ("Such a rule makes sense given that creditors already have a strong incentive to refrain from badgering their customers about overdue debts." (citing S. Rep. No. 95-382, at 2 (1977)). Thus, we must decide whether The Money Store "used" Moss Codilis's name in order to suggest that Moss Codilis, rather than The Money Store, was "collecting" the relevant debts. We conclude that, resolving all factual disputes in plaintiffs' favor, it did.

We have previously addressed the scope of the FDCPA's so-called false name exception only once before, in *Maguire v. Citicorp Retail Services*. In *Maguire*, the creditor, Citicorp, used the name "Debtor Assistance" in its collection letters, which was the name of its in-house collection unit. 147 F.3d at 236. We held that,

21

in determining whether this constituted the use of a "false" name, a court must apply an objective standard of whether the "least sophisticated consumer would have the false impression that a third party was collecting the debt." *Id.* (citing *Clomon*, 988 F.2d at 1318).

We found that the letterhead in *Maguire* created the impression that a third party called "Debtor Assistance" was collecting Citicorp's debt, and that the evidence in the record was unclear as to whether the plaintiff would have known that Debtor Assistance was affiliated with Citicorp. We therefore held that the letters were potentially misleading enough to trigger the application of the false name exception. Accordingly, we reversed the district court's grant of summary judgment, and remanded for further proceedings. *See id.* at 236–38. *Maguire* did not, however, address the situation we are confronted with here: whether the false name exception can be invoked when the creditor uses the name of an actual, non-affiliated third-party to collect its debts.

To resolve this question of statutory interpretation, we begin with the statutory text. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) ("Statutory construction must begin with the language employed by Congress and the

22

assumption that the ordinary meaning of that language accurately expresses the legislative purpose." (internal quotation marks omitted)).  Because the FDCPA is "remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated."  *N.C. Freed Co. v. Bd. of Governors of Fed. Reserve Sys.*, 473 F.2d 1210, 1214 (2d Cir. 1973); *accord Johnson v. Riddle*, 305 F.3d 1107, 1117 (10th Cir. 2002) (collecting cases); *see also Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22, 27 (2d Cir. 1989) ("Congress painted with a broad brush in the FDCPA to protect consumers from abusive and deceptive debt collection practices.").  Section 1692a(6) of the FDCPA provides, in relevant part, that any creditor, "who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts," will be deemed a "debt collector" and subject to liability under the FDCPA.  15 U.S.C. § 1692a(6).  The text of the exception thus sets forth three elements that must be satisfied before deeming a creditor a debt collector pursuant to the false name exception: (1) the creditor is collecting its own debts; (2) the creditor "uses" a name other than its own; and (3) the creditor's use of that name falsely indicates that a third person is "collecting

or attempting the collect" the debts that the creditor is collecting. The first element, that the creditor is collecting its own debts, is undisputedly satisfied here.

Turning to the latter two elements, in *Maguire* we described three ways that these elements could be satisfied: (1) the creditor uses a name that falsely implies that a third party is involved in collecting its debts; (2) the creditor pretends to be someone else; or (3) the creditor uses a pseudonym or alias. *Maguire*, 147 F.3d at 235. By separating the situation where a creditor falsely implies the involvement of a third party from the situation where a creditor uses a pseudonym, *Maguire* makes clear that the mere fact that the third-party whose name is used by the creditor is a real entity not affiliated with the creditor is not dispositive. *See White v. Goodman*, 200 F.3d 1016, 1018 (7th Cir. 2000) ("Conceivably [the false name exception] could be read so narrowly as to reach only the case in which the creditor is using a pseudonym; but this reading, as the cases interpreting section 1692a(6) make clear, is too narrow. . . . [T]he statute distinguishes between the use of pseudonyms . . . and a false representation that a third party (which may exist) is participating in debt collection . . . ." (citations

24

omitted)).  When presented with the allegation that a creditor has falsely implied that a third party is collecting the creditor's debts, we must examine both the actions of the creditor, *i.e.*, whether the creditor has "used" a name, and the role of the third party, *i.e.*, whether the third party is "collecting or attempt to collect" the creditor's debts.

Because neither "use" nor "collect" is defined in the statute, *see* 15 U.S.C. § 1692a, we give these terms their ordinary meaning.  *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012).  Starting with "use," dictionaries define "use" as, *inter alia*, "To make use of (some immaterial thing) as a means or instrument; to employ for a certain end or purpose."  2 The Compact Edition of the Oxford English Dictionary 3574 (1971); *see also* The American Heritage Dictionary of the English Language New College Edition 1410 (1976) ("To . . . employ for some purpose"); Webster's Third New International Dictionary 2524 (1976) ("[T]o carry out a purpose or action by means of").[7]  By requiring the

---

[7] We are aware that Webster's Third New International Dictionary has not garnered the greatest respect from a majority of the Justices of the Supreme Court, *see e.g.*, *Taniguchi*, 132 S. Ct. at 2003; *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 228 n.3 (1994), but cite it as a dictionary that employs a definition in agreement with other dictionaries contemporaneous to the enactment of the FDCPA.

creditor to "use" or "employ for some purpose" a name other than its own, the text of the statute is clear that there must be some active involvement in the misrepresentation by the creditor before triggering liability under the false name exception. The exception does not create backdoor vicarious liability for creditors simply because the collection agencies they hire to collect their debts engage in deceptive practices. *Williams v. Citibank, N.A.*, 565 F. Supp. 2d 523, 529 (S.D.N.Y. 2008).[8]

Here, the relevant affirmative action by The Money Store was retaining Moss Codilis for the express purpose of sending breach letters that appeared to be attorney collection letters to its debtors. Although we did not address what constitutes sufficient affirmative action by the creditor in *Maguire*, an analogous case from the Seventh Circuit, *Boyd v. Wexler*, makes clear why the alleged misrepresentation of Moss Codilis's role here can be attributed to The Money Store's "use" of Moss Codilis's name in the breach letters. 275 F.3d 642 (7th Cir.

---

[8] The dissent argues that our holding today "will prove vexing" over time because a creditor could hypothetically be held liable under the FDCPA "merely for hiring a debt collector whose practices are deemed inadequate in some respect." Dissent at 19. This fear is unwarranted. It ignores entirely our discussion of what the false name exception's "use" element requires. We repeat,

2001).  In *Boyd*, the Seventh Circuit addressed the issue of a collection agency's liability for paying a lawyer to use his letterhead on its collection letters.  The Court of Appeals explained that such a practice violates section 1692e because "the lawyer is allowing the collection agency to *impersonate* him.  The significance of such *impersonation* is that a debtor who receives a . . . letter signed by a lawyer will think that a lawyer reviewed the claim and determined that it has at least colorable merit."  *Id.* at 644 (emphasis added).  Although *Boyd* addressed section 1692e liability as against a debt collector, we see no reason why this "impersonation" would not apply equally to a creditor's "use" of a name under section 1692a(6)'s false name exception.  *See Taylor v. Perrin, Landry, deLauney & Durand*, 103 F.3d 1232, 1235 (5th Cir. 1997) (holding that creditor may be held liable under false name exception for sending a form "attorney demand letter" that had been pre-prepared "by [an attorney] for [the creditor] to use in collecting or attempting to collect from the debtor" and which "bore the letterhead of the [attorney's] law firm and the facsimile of [the attorney's] signature").  When a creditor that is collecting its own debts hires a third party for the purpose of

---

for emphasis: the exception does not create backdoor vicarious liability for creditors.

sending letters that represent that the third party is collecting the debts, that is sufficient to show the "use" of a name by the creditor other than its own. *See also White*, 200 F.3d at 1018 (describing the creditor as the "primary violator" in a flat-rating case).

The "use" element focuses on whether the creditor has actively engaged in misrepresenting its identity in some way; by contrast, the "collecting or attempting to collect" element focuses on whether the third party's role is in fact being misrepresented. *See id.* (noting that if a "third party is participating in the debt collection, . . . there is no deception"). Even if The Money Store "use[d]" Moss Codilis's name in collecting its own debts, the false name exception does not apply if in fact Moss Codilis was collecting or attempting to collect The Money Store's debts such that there was no misrepresentation to the consumer.[9]

---

[9] In finding the false name exception inapplicable here, the district court relied in part on our statement in *Maguire* that "[t]he triggering of the FDCPA does not depend on whether a third party is in fact involved in the collection of a debt, but rather whether a least sophisticated consumer would have the false impression that a third party was collecting the debt." *Mazzei*, 349 F. Supp. 2d at 659–60 (quoting *Maguire*, 147 F.3d at 236). This language, however, does not mean that a court should ignore the factual question of whether a third-party who exists is collecting or attempting to collect a creditor's debts. Rather, this portion of *Maguire* was intended to rebut the argument that because the creditor, Citigroup, and its misleadingly titled "third-party," Debtor Assistance, were in fact

*Id.*; *cf. Greco v. Trauner, Cohen & Thomas L.L.P.*, 412 F.3d 360, 364-65 (2d Cir. 2005) (holding no misrepresentation, and thus no 1692e liability against the debt collector law firm, where the law firm retained by the creditor clearly disclosed in the letter that the law firm was not acting as an attorney).

The plain meaning of "collect" in the context of debts is "[t]o gather (contributions of money, or money due, as taxes, etc.) from a number of people." 1 The Compact Edition of the Oxford English Dictionary 465; *see also* The American Heritage Dictionary of the English Language New College Edition 261 ("To call for and obtain payment of"); Webster's Third International Dictionary 444 ("[T]o receive, gather, or exact from a number of persons or other sources"). This definition, while useful to the inquiry, is ultimately ambiguous as applied to the facts of any particular case. It does not define how involved a debt collector must be before we can fairly say it is gathering money on behalf of the creditor.[10]

---

affiliated, the creditor had not "use[d] a[] name other than its own." *Maguire*, 147 F.3d at 236. The focus of the false name exception, in any case, is on whether the creditor has used a name to disguise to the consumer who is actually collecting the debt. *See id.*

[10] Where the text of the statute is ambiguous, we frequently resort to legislative history to assist us in interpreting the provision. *See United States v. Dauray*, 215 F.3d 257, 265 (2d Cir. 2000). But the legislative history of the FDCPA is unhelpful here. None of the relevant congressional reports or hearings addressed the

The Money Store argues that Moss Codilis was involved in the debt collection process by generating the breach letters and sending them to the debtors. Moss Codilis, however, described its Breach Letter Program as an exercise in "mass processing." According to plaintiffs and Moss Codilis, other than printing and mailing the letters and dealing with some follow-up limited to directing substantive phone calls from debtors to The Money Store, all meaningful collection efforts or attempts to "gather" the money owed were handled by The Money Store.

We reject The Money Store's contention that by generating and mailing the breach letters alone, Moss Codilis was "collecting or attempting to collect" The Money Store's debts. Under our holding in *Maguire*, if The Money Store had

applicability or scope of the false name exception. *See generally* S. Rep. No. 95-382 (1977); H.R. Rep. No. 95-131 (1977); H.R. Rep. No. 94-1202 (1976); *Fair Debt Collection Practices Act: Hearings on S. 656, 918, 1130 and H.R. 5294 Before the Subcomm. on Consumer Affairs of the S. Comm. on Banking, Housing and Urban Affairs*, 95th Cong. (1977); *Debt Collection Practices Act: Hearings on H.R. 29 Before the Subcomm. on Consumer Affairs of the H. Comm. on Banking, Currency, and Urban Affairs*, 95th Cong. (1977); *Consumer Information: Hearings Before the Subcomm. on Consumer Affairs of the H. Comm. on Banking, Finance, and Urban Affairs*, 95th Cong. (1977); *Debt Collection Practices Act: Hearings on H.R. 11969 Before the Subcomm. on Consumer Affairs of the H. Comm. on Banking, Currency, and Housing*, 94th Cong. (1976); *Oversight on Consumer Protection Activities of Federal Banking Agencies:*

simply purchased letterhead from Moss Codilis and sent out the debt collection letters on Moss Codilis letterhead, The Money Store would be liable. *See Maguire*, 147 F.3d at 235; *Taylor*, 103 F.3d at 1236, 1239; *see also Sokoloski v. Trans Union Corp.*, 53 F. Supp. 2d 307, 312 (E.D.N.Y. 1999) ("[A] creditor participating in [a] flat-rating arrangement can be liable under the [false name exception].").  And if instead The Money Store had provided the precise text of the letters to Moss Codilis, which then printed them on Moss Codilis letterhead and mailed them,[11] it would be a hyper-technical distinction to conclude that Moss Codilis was "collecting or attempting to collect" The Money Store's debts by physically printing and mailing the letters.  Thus, "collecting" debts must mean something more than *any* role, no matter how tangential, in the collection process.  Merely changing the return address from The Money Store to Moss Codilis does not alter the force of *Maguire* because it does not change whether the letter misleads consumers, which we have explained is the statutory touchstone for all aspects of the FDCPA, including the false name exception.  *Maguire*, 147 F.3d at 236; *see also*

---

*Hearings Before the S. Comm. on Banking, Housing and Urban Affairs*, 94th Cong. (1976).

[11] Or alternatively, The Money Store sent the letters in sealed, stamped envelopes to Moss Codilis with the note "please mail."

*Clomon*, 988 F.2d at 1318. Accordingly, the fact that Moss Codilis sent deceptive letters in and of itself is not conclusive evidence of Moss Codilis collecting or attempting to collect The Money Store's debts.

Our rejection of this argument is supported by the Federal Trade Commission's interpretative guidance on section 1692e(14), which prohibits a debt collector from "us[ing] . . . any business, company, or organization name other than the (collector's) true name." *See* FTC, Statements of General Policy or Interpretation Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50,097, 50,107 (Dec. 13, 1988).[12] Addressing the scope of the section as applied to creditors, the FTC has suggested:

> A creditor violates this section if he uses the name of a collection bureau as a *conduit* for a collection process that the creditor controls in collecting his own accounts. . . . A creditor does not violate this provision where an affiliated (and differently named) debt collector undertakes collection activity, if the debt collector does business separately from the creditor (e.g., where the debt collector in fact has other clients that he treats similarly to the creditor, has his own

---

[12] Although the FTC Staff Commentary is likely not entitled to *Chevron* deference, we look to the FTC's informal opinions as persuasive authority. *See Gulley v. Markoff & Krasny*, 664 F.3d 1073, 1074–75 (7th Cir. 2011) (holding that because Commentary "is based primarily on issues discussed in informal staff letters," it is not entitled to *Chevron* deference pursuant to *United States v. Mead Corp.*, 533 U.S. 217, 234 (2001), and receives only "respectful consideration" (internal quotation marks omitted)).

employees, deals at arms length with the creditor, and controls the process himself).

*Id.* (emphasis added).[13]  The FTC Staff Commentary distinguishes between a third-party acting as a mere "conduit for a collection process that the creditor controls" from "undertak[ing] collection activity . . . separate[] from the creditor."

*Id.*[14]

---

[13] The dissent finds this guidance unhelpful because it addresses section 1692e(14) and does not explicitly cite section 1692a(6)'s false name exception. Dissent at 16 n.6.  We think this is a cramped interpretation of FTC's guidance. The guidance addresses how section 1692e(14) applies to *creditors*, and, in our view, thus implicitly relies on section 1692a(6)'s false name exception to explain how a creditor can be held liable as a debt collector for violating section 1692e(14).

[14] The district court here appeared to apply a more stringent version of the test outlined by the FTC.  Specifically, in *Mazzei*, the district court concluded, *inter alia*, that The Money Store did not "own[] and control[] the debt collector, rendering it the creditor's alter ego."  *See Mazzei*, 349 F. Supp. 2d at 659–61.  The question, however, is not whether the debt collector is the creditor's alter ego, but whether the creditor controlled "a collection *process*" that it used to collect its own debts. 53 Fed. Reg. at 50,107 (emphasis added); *see also* 15 U.S.C. § 1692a(6) (exception applies to a creditor "who, in the *process* of collecting [its] own debts," uses a false name (emphasis added)).

The Seventh Circuit's approach to creditor liability lends further support to this "conduit" test.[15]  In *Nielsen v. Dickerson*, the Seventh Circuit held that creditors who retain an attorney to mass mail debt collection letters are "debt collectors" under the FDCPA's false name exception if the attorney has "neither made a considered, professional judgment that [the debtor] was delinquent on her debt and a candidate for legal action nor meaningfully involved himself in the decision to send the [collection] letter to any individual debtor."  *Nielsen v. Dickerson*, 307 F.3d 623, 635 (7th Cir. 2002) (internal quotation marks omitted). The Seventh Circuit in *Nielsen* relied on several factors to determine that "the true source" of the letter was the creditor, not the attorney.  *Id.* at 639.

First, the Court of Appeals noted that the attorney's review of the debtor information provided by the creditor was "ministerial" in nature, and "did not call for the exercise of professional judgment."  *Id.* at 636.  In particular, the court noted that the attorney who signed the letters:

> did not make the decision to send a letter to a debtor; [the creditor] did. . . . To the extent [the attorney] eliminated some names from the list of delinquent debtors that [the creditor] provided (based on

---

[15] So far as we can tell, aside from *Maguire*, *Taylor*, and the Seventh Circuit case law discussed here, no other federal court of appeals has addressed the scope of the false name exception in a precedential opinion.

anything more than obvious gaps or errors in [the creditor's] information), the record suggests that he did so based solely on the discovery that the debtor had declared bankruptcy, had already been sent a letter, or lived in one of three states which would not permit a letter of the kind that Dickerson had prepared. . . . [T]his was purely a categorical assessment rather than one calling for an individualized, discretionary assessment . . . .

*Id.* at 635-36. The court also noted that: (1) the attorney did not have access to debtors' files, but rather was simply given basic information on debtors by the creditor, *id.* at 636; (2) the collection letter sent to debtors "was a form letter that the firm . . . prepared and issued en masse" in an "assembly line fashion," *id.* at 637 (noting that the creditor referred around 2,000 accounts to the attorney each month); (3) the attorney "played barely more than a ministerial role in handling the responses to the letter" from debtors, *id.*; (4) the creditor paid the attorney "a flat fee" for each letter sent "regardless of the result (if any) that the letter produced," *id.*; and (5) the attorney "never took legal action in pursuit of [the creditor's] debts," *id.*

Similarly, in *White v. Goodman*, the plaintiffs sued the debt collection agency as a "flat-rater" under section 1692j who was not attempting to actually collect the debts owed, and sued the creditor under the false name exception.

*White*, 200 F.3d at 1019. The Seventh Circuit noted in dicta that "if [North Shore,

the debt collection agency,] were a flat-rater, Book-of-the-Month Club [the

creditor] might be liable under section 1692a(6)." *Id.* However, the Seventh

Circuit determined that North Shore was not a flat-rater because it did more than

simply process and mail letters to debtors. If the debtors failed to pay after

receiving the letters, the Book-of-the-Month Club would turn the debts over to

North Shore to determine what efforts to undertake to collect the debts. *Id.*

North Shore was then entitled to keep 35% of any amount it collected. *Id.*

Because North Shore was a "*bona fide* collection agency," it could not be liable as

a flat-rater, and Book-of-the-Month Club could not be liable under the false name

exception. *Id.*[16]

---

[16] The dissent suggests that we are creating an "odd liability gap" where a party
in Moss Codilis's shoes could be "too involved in collection to be flat-raters
under § 1692j, but not involved enough to be 'actually' collecting or attempting to
collect any debts . . . under § 1692a(6)." Dissent at 18. The only way out of this
gap, according to the dissent, is if we intend that the *bona fide* standard is simply
the inverse of § 1692j's flat-rating standard. We mean precisely that, as did the
Seventh Circuit in *White* when it explained that "if [the debt collection agency]
were a flat-rater, [the creditor] might be liable under section 1692a(6)." *White*, 200
F.3d at 1019.

The dissent characterizes this as an "implausible construction of § 1692j,"
Dissent at 18, but we disagree. Although the dissent relies on the word

We therefore hold that, when determining whether a representation to a debtor indicates that a third party is collecting or attempting to collect a creditor's debts, the appropriate inquiry is whether the third party is making *bona fide* attempts to collect the debts of the creditor or whether it is merely operating as a "conduit" for a collection process that the creditor controls. *Id.*; 53 Fed. Reg. at 50,107. This is a question of fact. In this case, at the summary judgment stage, we cannot find as a matter of law that Moss Codilis was engaged in such *bona fide* efforts. Moss Codilis described its Breach Letter Program as an "exercise in mass processing." Resolving the disputed issues of fact in favor of plaintiffs, the sole function of the Program appears to have been to allow creditors to falsely represent to debtors that debt collection letters were "from" a law firm that had been retained to collect the delinquent debt.

Viewed in this light, the jury could conclude that the letters received by plaintiffs appear to be "from" The Money Store in every meaningful sense of the

"furnishes" in section 1692j to mean that a debt collection agency that "sends" the forms to the debtor cannot be held liable as a flat-rater, we are not persuaded that such a narrow reading is correct. *See, e.g., Nielsen*, 307 F.3d at 639 ("[Section 1692j(a)] bars the practice commonly known as 'flat-rating,' in which an individual *sends a delinquency letter to the debtor* portraying himself as a debt

word.  The Money Store reviewed and maintained possession over its debtors'
files.  According to Nash, Moss Codilis merely received spreadsheets from The
Money Store containing the information of debtors who The Money Store had
determined were delinquent, added the debtor's information onto a form letter
with Moss Codilis letterhead, and mailed the letters.  While Nash performed
minimal reviews of the debtor information provided to her and could request
loan documents for a "questionable account," her statements suggest that this
review was limited to purely ministerial tasks like ensuring that The Money Store
had provided her with complete address information.  Indeed, Nash indicated
that The Money Store typically sent Moss Codilis batches of borrower
information that "usually exceeded 1000 borrowers," and required Moss Codilis
to mail all the Breach Letters by the next day.

Notwithstanding its limited involvement, Moss Codilis sent out letters to
plaintiffs stating that "this law firm" has been "retained" in order to "collect a
debt for our client."  The jury could find that this falsely implied that Moss
Codilis was attempting to collect The Money Store's debts and would institute

collector, when in fact he has no real involvement in the debt collection effort
. . . ." (emphasis added)).  Regardless, this issue is not before us.

legal action against debtors on behalf of The Money Store if the debtors did not

resolve the delinquency. Thereafter, plaintiffs argue that Moss Codilis performed

virtually no role in the actual debt collection process—besides the essentially

ministerial tasks of verifying the debt with The Money Store, informing debtors

of the identity of their creditor, and verifying whether a debtor's debts had been

discharged in bankruptcy.

Indeed, the facts here, taken in the light most favorable to plaintiffs, are

nearly identical to *Nielsen*, where the Seventh Circuit found:

> Having reached [the] conclusion [that the attorney, Dickerson,
> violated sections 1692e(3) & (10)], the actual source of the letter is
> obvious. It was Household [the creditor] that selected the debtors to
> whom Dickerson's letter was to be sent. It was Household that
> provided the information that Dickerson needed regarding the
> identity of the debtor and the amount of his or her delinquency in
> order complete the letter. It was Household on which Dickerson
> relied for the determination that the debtor was indeed delinquent
> and therefore an appropriate recipient of the letter. It was
> Household that reserved the right to approve issuance of the letters.
> It was ultimately Household that handled all responses to
> Dickerson's letter. And it was Household that decided what further
> action (including legal action) would be taken in the wake of
> Dickerson's letter.

*Nielsen*, 307 F.3d at 639.

We therefore conclude that a jury could find that Moss Codilis was not collecting The Money Store's debts and instead acted as a mere "conduit" for a collection process that The Money Store controlled. 53 Fed. Reg. at 50,107. And if the breach letters falsely indicated that Moss Codilis was "collecting or attempting to collect" The Money Store's debts, The Money Store can be held liable under the FDCPA pursuant to the false name exception. 15 U.S.C. § 1692a(6).[17] Accordingly, the district court erred in granting The Money Store summary judgment on plaintiffs' FDCPA claims, and we vacate its dismissal of their claims and remand for further proceedings.[18]

---

[17] We do not reach plaintiffs' argument that we should adopt the Seventh Circuit's approach to the false name exception for the specific situation where the third party is held out by the creditor as an *attorney*. Under this approach, the Seventh Circuit asks whether the third-party has exercised his independent judgment as an attorney in reviewing each debtor's individual case before sending out a letter. *See Nielsen*, 307 F.3d at 634; *see also Miller*, 321 F.3d at 301 (requiring "some degree of attorney involvement" when debt collection letters are sent by attorneys holding themselves out as retained attorneys to avoid section 1692e liability).

[18] The dissent argues that we are conflating "the deception of a creditor who uses a third party's name with the deception of a third-party debt collector who falsely claims to be acting as an attorney." Dissent at 2-3. We are not. Quite the contrary, it is the dissent that conflates section 1692a(6)'s false name exception, which can be invoked where the creditor falsely "indicate[s] that a third person is collecting or attempting to collect [its *specific*] debts," with the general definition of "debt collector," which is defined as "any person who uses any

*II.     TILA Liability*

We next turn to plaintiffs' claims that The Money Store violated the Truth

in Lending Act.  Plaintiffs contend that The Money Store violated section 1666d

of TILA by failing to refund credit balances owed to them on their accounts.  *See*

15 U.S.C. § 1666d ("Whenever a credit balance in excess of $1 is created in

connection with a consumer credit transaction . . . the creditor shall . . . refund

any part of the amount of the remaining credit balance, upon request of the

consumer."); *see also* 12 C.F.R. § 226.21 (implementing regulation).  Specifically,

plaintiffs argue that The Money Store charged their accounts unauthorized fees

and expenses in excess of that permitted under state law, resulting in credit

balances that defendant failed to refund.

TILA seeks to "protect . . . consumer[s] against inaccurate and unfair credit

billing and credit card practices" and promote "the informed use of credit" by

"assur[ing] a meaningful disclosure" of credit terms.  15 U.S.C. § 1601(a).  It

---

instrumentality of interstate commerce or the mails in any *business the principal
purpose of which is the collection of any debts*, or who *regularly collects* or attempts to
collect, directly or indirectly, debts owed or due or asserted to be owed or due
another."  15 U.S.C. § 1692a(6) (emphasis added).  Thus, a person can be a debt
collector by regularly collecting debts or being involved in a debt collection

41

imposes general liability only on creditors and greatly circumscribes the liability

of assignees. *See* 15 U.S.C. §§ 1640(a); 1641(e). TILA defines a "creditor" as a

person who both:

> (1) regularly extends, whether in connection with loans, sales of
> property or services, or otherwise, consumer credit which is payable
> by agreement in more than four installments or for which the
> payment of a finance charge is or may be required, and (2) is the
> person to whom the debt arising from the consumer credit
> transaction is initially payable on the face of the evidence of
> indebtedness or, if there is no such evidence of indebtedness, by
> agreement.

15 U.S.C. § 1602(g). This definition "is restrictive and precise, referring *only* to a

person who satisfies *both* requirements" of the provision. *Cetto v. LaSalle Bank*

*Nat'l Ass'n*, 518 F.3d 263, 270 (4th Cir. 2008).

In addition to this statutory definition of a "creditor," the Federal Reserve

Board's "Regulation Z" interprets the second prong of TILA's definition of

creditor as applying to only "[a] person . . . to whom the obligation is initially

payable, either on the face of the note or contract, or by agreement when there is

no note or contract." 12 C.F.R. § 226.2(a)(17)(i); *cf. Gambardella v. G. Fox & Co.*, 716

F.2d 104, 106 (2d Cir. 1983) (describing Regulation Z as among the "regulations

---

business even though that person does not collect the debt at issue in a given
case.

42

promulgated by the [Federal Reserve Board]" to "implement[]" TILA).  The

Supreme Court has indicated that Regulation Z is entitled to *Chevron* deference

where the Federal Reserve has reasonably interpreted an ambiguous term of

TILA.  *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239–44 (2004)

(reversing court of appeals for failing to defer).  The Federal Reserve Board's

Official Staff Commentary to Regulation Z further provides that "[i]f an

obligation is initially payable to one person, that person is the creditor even if the

obligation by its terms is simultaneously assigned to another person."  12 C.F.R.

pt. 226, supp. I at 300 (2000); *see Riviere v. Banner Chevrolet, Inc.*, 184 F.3d 457, 461

(5th Cir. 1999) (holding that a car dealer to whom loan obligation was initially

payable was the sole creditor even though loan was immediately assigned to a

financing company); *Mayfield v. Gen. Elec. Capital Corp.*, No. 97 Civ. 2786, 1999 WL

182586, at *3 (S.D.N.Y. Mar. 31, 1999) (interpreting the Official Staff Commentary

to Regulation Z to mean that the person to whom the debt is initially payable is

the only creditor "even when the contract provides for the immediate assignment

of the obligation").  "[T]he Official Staff Commentary promulgated by the

[Federal Reserve] Board as an interpretation of Regulation Z may warrant

43

deference as a general matter." *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 882 (2011); *accord Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980) ("Unless demonstrably irrational, Federal Reserve Board staff opinions construing [TILA] or [Regulation Z] should be dispositive . . . .").

We agree with the district court that The Money Store is not "the person to whom the debt arising from the consumer credit transaction [was] initially payable on the face of the evidence of indebtedness," 15 U.S.C. § 1602(g), and is therefore not a "creditor" under TILA with respect to the transactions at issue here. Specifically, the district court correctly rejected plaintiffs' central argument that the loans in question were "initially payable" to The Money Store "because the assignments to The Money Store Defendants occurred before the funds were disbursed to [some of] the plaintiffs and before [those] plaintiffs made their first loan payments." *Vincent v. Money Store*, No. 03 Civ. 2876 (JGK), 2011 WL 4501325, at *4 (S.D.N.Y. Sept. 29, 2011). TILA establishes a straightforward, objective inquiry for determining the identity of the creditor: it is "the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(g). Here, the initial

44

lenders on the loans were entities other than The Money Store. *See, e.g.,* J. App'x 851 (Vincent Note stating that "In return for a loan that I have received, I promise to pay U.S. $ 67,600 . . . to the order of the Lender. The Lender is ACCUBANK MORTGAGE CORPORATION. I understand that the Lender may transfer this Note.").

While all the Notes were eventually assigned to The Money Store, the Federal Reserve Board's Official Staff Commentary to Regulation Z provides that "[i]f an obligation is initially payable to one person, that person is the creditor, even if the obligation by its terms is simultaneously assigned to another person." 12 C.F.R. pt. 226, supp. I, at 300 (2000). The Notes in question here were not even simultaneously assigned to The Money Store. Each of the assignments took place by means of a separate endorsement, commenced after the Notes had been fully executed.

Plaintiffs are correct that, at least with respect to the Gutierrez and Garrido Notes, these assignments occurred before the first payment was due on the loan—and so, in a literal sense, the "initial payment" was made to The Money Store. This, however, is irrelevant under the Federal Reserve Board's

Commentary to Regulation Z. Otherwise, the Commentary's guidance that simultaneous assignments do not alter the identity of the "creditor" under TILA would make no sense; the assignee of a simultaneous assignment will presumably always be the first "person" to whom an initial loan payment is made. TILA does not define "creditor" as the person to whom the first loan payment is made; rather, it asks to whom the loan is "initially payable on the face of the evidence of indebtedness." With respect to each of the plaintiffs' loans, that person is an entity other than The Money Store.

Although we conclude that the district court correctly determined that The Money Store is not a "creditor" under TILA, we note that plaintiffs have identified an apparent oversight in the statute. Specifically, the provision of TILA plaintiffs claim The Money Store has violated, section 1666d, requires a "creditor" to "credit the amount of [any] credit balance [over $1] to the consumer's account" and "refund any part of the amount of the remaining credit balance, upon request of the consumer." 15 U.S.C. § 1666d(A)-(B). We agree with plaintiffs that restricting the application of section 1666d to the initial lender does not make much sense. Unlike most of TILA's provisions, which require

46

creditors to make certain disclosures to debtors at the time of a loan's execution, *see, e.g., id.* §§ 1604, 1631-51, section 1666d imposes obligations on creditors throughout the life of the loan. Indeed, we can think of no reason why Congress would require a credit balance in a consumer's account be refunded only if the balance was maintained by the original creditor and not a subsequent assignee. Moreover, as plaintiffs note, given the widespread prevalence of mortgage loan originators selling such loans for securitization, this definition renders section 1666d inapplicable to a substantial number of mortgage loans.

Legislative history suggests that this gap may be an unintended consequence of congressional reform to TILA. *See Union Carbide Corp. & Subsidiaries v. Comm'r*, 697 F.3d 104, 109 (2d Cir. 2012) ("Agencies are charged with implementing legislation that is often unclear and the product of an often-messy legislative process. Trying to make sense of the statute with the aid of reliable legislative history is rational and prudent." (internal quotation marks omitted)). In 1980, Congress amended TILA to limit assignees' exposure to liability, allowing the imposition of liability on an assignee "only if the violation for which such action or proceeding is brought is apparent on the face of the

disclosure statement." *Taylor v. Quality Hyundai, Inc.*, 150 F.3d 689, 692 (7th Cir. 1998) (quoting 15 U.S.C. § 1641(a)). "Prior to this amendment, the statutory provisions that assured transfer of the forms containing the TILA disclosures to the assignee also made it possible for the debtor to claim that the assignee had 'knowledge' of the violation." *Id.* at 693. Accordingly, based on the recommendation of the Federal Reserve Board, Congress "simplifie[d] the definition of 'creditor' . . . [to] eliminate confusion under the current act as to the responsibilities of assignees." S. Rep. No. 96-368, at 24 (1979).

In its initial Report accompanying the amendments to TILA, the Senate Banking, Housing, and Urban Affairs Committee explained as follows:

> This [amendment] eliminates two uncertainties under present law as to an assignee's liability for an original creditor's violation of the act. Under present law, an assignee is generally liable only where a violation is "apparent on the face" of the disclosure statement. What types of violations are covered is unclear. This section provides that violations are apparent on the face of a disclosure statement when disclosures are inaccurate or incomplete based on the statement or other documents involved, and where incorrect terminology is utilized.

> In addition, this section eliminates ambiguity on the question of assignee liability for rescission by stating explicitly that a consumer's exercise of this right is effective against an assignee. Without such protection for the consumer, the right of rescission would provide little or no effective remedy.

S. Rep. No. 96-73, at 18 (1979).

During the hearings held on the precursor reform bill, the Truth In Lending Simplification and Reform Act, the testimony related to the issue of assignee liability focused almost exclusively on disclosure requirements. For example, testifying in support of the amendment, the American Bankers Association noted that decisions by federal courts of appeals had complicated situations where multiple parties financed loans, and that limiting the definition of creditor to the initial creditor "clarif[ies] that only one creditor must make *disclosures.*" *Truth in Lending Simplification and Reform Act: Hearing on S. 108 Before the S. Comm. On Banking, Housing, and Urban Affairs*, 95th Cong. 84–85 (1979) (emphasis added) (statement of David S. Smith, on behalf of the Am. Bankers Ass'n); *see, e.g., Meyers v. Clearview Dodge Sales, Inc.*, 539 F.2d 511 (5th Cir. 1976)). The Federal Reserve recommendation cited in the Senate Report accompanying the final bill noted:

> One issue that spawned extensive litigation is who must make the disclosures if there is more than one creditor in the transaction. The Board recommends that only one disclosure statement be required and that the obligation to disclose be placed upon the creditor to whom the obligation is made payable on its face. This provides a simpl[e] mechanical rule for creditors to follow and should insure that consumers get the required disclosures.

49

*Id.* at 96 (statement of Robert Evans, Nat'l Consumer Fin. Ass'n) (quoting testimony of Federal Reserve Board Governor Jackson).

Based on the foregoing, it appears reasonable to conclude that when Congress amended TILA, its primary concern was limiting assignee liability for an initial creditor's violations of TILA's *disclosure* requirements. Indeed, in the same breath, the Senate Banking Committee Report clarified that consumers could continue to exercise their right to rescission against assignees, in the absence of which the right "would provide little or no effective remedy." S. Rep. No. 96-73, at 18; *see also* 15 U.S.C. § 1635(a) (debtor has right to rescind any credit transaction that creates a security interest in the debtor's principal dwelling within three business days); *Consumer Information: Hearings Before the Subcomm. on Consumer Affairs of the H. Comm. on Banking, Finance, and Urban Affairs*, 95th Cong. 152–53 (1977) (statement of Christian S. White, Assistant Director for Special Statutes, FTC) (requesting amendments to TILA to ensure rescission provisions can be enforced against assignees). But by changing the definition of "creditor" to exclude assignees without also creating an explicit carveout for a consumer's

ongoing right to be refunded a credit balance, consumers cannot rely on TILA as a remedy to force an assignee to refund a credit balance, as is the case here.[19]

We cannot say Congress was unaware of the consequences of changing the definition of creditor as it debated the amendments to TILA. At the above-referenced Senate hearing, the statement of Robert J. Hobbs, a staff attorney at the National Consumer Law Center, explicitly addressed the issue we are faced with here. Mr. Hobbs explained:

> Section 21. Return of Customer Credit Balances. A series of FTC actions against large creditors who were holding millions of dollars of their customer's unpaid refunds focused attention on the problems addressed by section 21. This section adds to the present law the responsibilities of paying such balances after six months and of taking reasonable steps to trace the consumer's present address if it has changed. This section also expands these obligations to all 'creditors' *although that term is considerably circumscribed by Section 2 of § 2802. The obligations of TILA § 165 should also run to assignees.*

---

[19] Plaintiffs argue in the alternative that summary judgment was inappropriate here because, for at least some of the loans, the initial creditor may have been a broker, and therefore would not count as a creditor for TILA purposes. But the district court noted that each of the plaintiffs received TILA disclosure statements from lenders other than The Money Store, which are required to be made by the "creditor," 15 U.S.C. §§ 1631 & 1635, "evidenc[ing] the fact that the original lenders, rather than The Money Store Defendants, were 'creditors' for purposes of TILA." Plaintiffs offer no arguments that show this conclusion was in error.

*Truth in Lending Simplification and Reform Act: Hearing on S. 108 Before the S. Comm. on Banking, Housing, and Urban Affairs*, 96th Cong. 43–44 (1979) (emphasis added).

"It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (internal quotation marks omitted). We may think it unwise to allow an assignee to escape TILA liability when it overcharges the debtor and collects unauthorized fees, where the original creditor would otherwise be required to refund the debtor promptly. But such a result is not "absurd." We will not rewrite the text of the statute, nor will we refuse to defer to the Federal Reserve's consideration of the liability of assignees in Regulation Z. We note this discrepancy, however, for the benefit of Congress and the Federal Reserve. *See generally* Robert A. Katzmann, *Statutes*, 87 N.Y.U. L. REV. 637, 685–93 (2012) (suggesting judiciary should inform Congress of its opinions interpreting federal statutes). For the reasons stated above, The Money Store is not a "creditor" under TILA and the district court correctly dismissed the plaintiffs' TILA claims.

**CONCLUSION**

Accordingly, the district court's judgment is **AFFIRMED** in part,

**VACATED** in part, and **REMANDED** for further proceedings consistent with

this Opinion.

KATZMANN, *Chief Judge*, concurring:

Unsurprisingly, I concur in the Court's judgment and agree with its reasoning. I write separately to address the argument regarding the false name exception to creditor liability under the FDCPA that the majority opinion declined to address as unnecessary. *See supra*, at 40 n.17. Specifically, I agree with the Seventh Circuit that where a creditor uses the name of a lawyer or law firm to represent falsely that an attorney has been retained to collect the creditor's debt, the false name exception should apply if the lawyer misrepresents his role as an attorney. *See Nielsen v. Dickerson*, 307 F.3d 623, 634–39 (7th Cir. 2002).

As the majority opinion notes, where the third party is held out by the creditor as an attorney retained to collect the creditor's debts, the Seventh Circuit asks whether the third-party has exercised his independent judgment as an attorney in reviewing each debtor's individual case before sending out a letter. *See id.* Our Circuit has applied an identical standard to whether an attorney debt-collector has engaged in deceptive practices in violation of section 1692e to the question of whether to pierce creditor immunity under section 1692a(6)'s

1

false name exception.   *Compare id.*, *with Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 301, 306–07 (2d Cir. 2003) (citing *Nielsen* with approval).   Although the majority opinion here does not reach the issue because there is a dispute as to whether Moss Codilis acted as even an ordinary debt collector, I write to explain why I think we should adopt *Nielsen* wholesale.

My reasoning is simple.   We have previously held that the focus of the false name exception—indeed, the focus of the entire FDCPA—is on what the "least sophisticated consumer" believes to be true based on the representations made in the debt collection letter.   *See Maguire v. Citicorp. Retail Servs., Inc.*, 147 F.3d 232, 236 (2d Cir. 1998); *see also Greco v. Trauner, Cohen & Thomas, L.L.P.*, 412 F.3d 360, 363 (2d Cir. 2005).   Where a debt collector holds himself out to the consumer as an attorney retained to collect the debt, we have held that an attorney must be meaningfully involved—*i.e.*, exercise some degree of professional judgment—so as not to misrepresent his role to the consumer. *Miller*, 321 F.3d at 301, 306–07; *Clomon v. Jackson*, 988 F.2d 1314, 1321 (2d Cir. 1993).   Therefore, it would be entirely consistent with the approach to FDCPA liability we have followed thus far to hold that where the creditor uses the name

2

of an attorney to collect its debts, we should evaluate whether the use of that name misleadingly indicates that the attorney acted in his professional capacity. *See Nielsen*, 307 F.3d at 634. *Nielsen* accords with both the text of the statute and our prior precedent.

One may object that such an approach may expose a creditor to liability where the creditor hired a debt collector to collect its debts, but the debt collector impersonated an attorney on his own accord. Not so. As the Court's opinion explains, a creditor must be "actively engaged in [the] misrepresent[ation]" to "use" the name of another and be held liable under the false name exception. *Supra*, at 28. If the creditor is not involved in misrepresenting the debt collector as an attorney, then the false name exception does not apply. Accordingly, if such a case presents itself, I believe we should follow *Nielsen*.

DEBRA ANN LIVINGSTON, *Circuit Judge*, concurring in part and dissenting in part:

Finding "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many *debt collectors*," 15 U.S.C. § 1692(a) (emphasis added), Congress enacted the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA" or "Act"), "to eliminate [such] practices, to ensure that debt collectors who abstain from such practices are not competitively disadvantaged, and to promote consistent state action to protect consumers." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S. Ct. 1605, 1608 (2010). To this end, the FDCPA imposes civil liability for prohibited debt collection practices on *debt collectors*—those who "regularly collect[] or attempt[] to collect . . . debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The Act does not, by its terms, impose liability on creditors. *See Maguire v. Citicorp Retail Servs., Inc.*, 147 F.3d 232, 235 (2d Cir. 1998); *see also Schmitt v. FMA Alliance*, 398 F.3d 995, 998 (8th Cir. 2005) (noting the distinction between creditors and debt collectors "is fundamental to the FDCPA, which does not regulate creditors' activities") (quoting *Randolph v. IMBS, Inc.*, 368 F.3d 726, 729 (7th Cir. 2004)) (internal quotation marks omitted).

There is one narrow exception to this rule: the Act treats as a debt collector "any creditor who, in the process of collecting his own debts, uses any name other

1

than his own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6). This "false name" exception thus limits creditor liability to those creditors who collect their own debts while operating under a pseudonym or name of another—perhaps on the theory that such creditors, by freeing themselves of any motivation to protect their own names, have become sufficiently like debt collectors as to merit FDCPA regulation. *See Harrison v. NBD Inc.*, 968 F. Supp. 837, 841 (E.D.N.Y. 1997) (noting false name exception addresses circumstance where "natural restraint" exerted on creditors by desire to protect good will not present). At any rate, and whatever the rationale behind the false name exception, creditors are not otherwise subject to the FDCPA, be it under the Act's plain language or under this Circuit's case law.

Or at least not until today. The majority now interprets the FDCPA as imposing liability not just on those creditors who deceptively employ false names to collect their own debts, but also on those who take the unremarkable step of hiring a debt collector to collect their debts—so long as that debt collector is, in the majority's view, insufficiently involved in "*bona fide*" collection efforts. *See* Maj. Op. at 5, 37. Today, the majority's approach conflates the deception of a creditor who uses a third party's name with the deception of a third-party debt collector who

2

falsely claims to be acting as an attorney. More fundamentally, its "*bona fide*" test will over time sow ambiguity into an otherwise straightforward statutory scheme, auguring both difficult line-drawing exercises for future courts and uncertain liability for creditors who contract with debt collectors to collect those creditors' debts. I therefore respectfully dissent from the majority's determination that the district court erred in granting summary judgment on Plaintiffs-Appellants' FDCPA claim. I concur in the judgment that The Money Store is not a "creditor" under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*

I.

The FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). Failure to comply with the Act's requirements exposes such persons to civil liability. *See id.* § 1692k(a). One such requirement is that a debt collector "may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." *Id.* § 1692e. This includes "[t]he false representation or implication that any individual is an attorney or that

3

any communication is from an attorney." *Id.* § 1692e(3).

In contrast, creditors, defined in relevant part as persons "who offer[] or extend[] credit creating a debt or to whom a debt is owed," *id.* § 1692a(4), are not regulated by the FDCPA and are not subject to liability under the Act for their own debt collection practices. The only exception is when creditors collect debts using the name of another, which then classifies them under the Act as debt collectors:

> The term "debt collector" . . . includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts.

*Id.* § 1692a(6).

The FDCPA further provides that "flat-raters"—third persons who assist a creditor in using a false name by "providing a form which creates the false impression that someone (usually a collection agency) besides the actual creditor is 'participating' in collecting the debt," *White v. Goodman*, 200 F.3d 1016, 1018 (7th Cir. 2000)—are also liable:

> (a) It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so

4

participating.

> (b) Any person who violates this section shall be liable to the same extent and in the same manner as a debt collector is liable under section 1692k of this title for failure to comply with a provision of this subchapter.

15 U.S.C. § 1692j.

## II.

As relevant here, plaintiffs Lori Jo Vincent, Ruth Ann Gutierrez, and Linda and John Garrido brought a putative class action against The Money Store on behalf of themselves and all others similarly situated alleging violations of the FDCPA in "attempting to collect amounts purportedly owed on residential home equity loans." J.A. 33-34. The record is devoid of evidence, however, that The Money Store itself ever communicated with any of the named plaintiffs regarding their loan defaults, much less that it attempted to collect money from them "using any name other than [its] own." 15 U.S.C. § 1692a(6). Instead, each plaintiff received a letter from Moss, Codilis, Stawiarski, Morris, Schneider & Prior, LLP ("Moss Codilis"). These letters informed each debtor of his or her default, noting variously that Moss Codilis had been "retained," "authorized," or "designated" to contact the debtor regarding the

5

status of the account.[1]  As required by the FDCPA, *see* 15 U.S.C. § 1692g(a)(4), the letters further advised the debtors that if they disputed the debt in writing within 30 days of receipt, Moss Codilis would provide verification of the debt.  Also as required by the FDCPA, *see id.* § 1692g(a)(5), the letters advised that Moss Codilis would inform the debtors of the name and address of the original creditor upon timely written notice.  The breach letters provided contact information for both Moss Codilis and The Money Store, referring recipients to Moss Codilis in connection with the above-referenced notifications, among other things, and generally referring debtors to The Money Store for the purpose of addressing payment.

Moss Codilis prepared and sent these letters pursuant to an April 1997 agreement between it and The Money Store.  In the Letter of Agreement, Moss Codilis principally agreed to prepare and send breach notification letters on a monthly basis to borrowers who had defaulted on their mortgage loans.  The firm further agreed to provide a "systems person or persons" to facilitate the transfer of data from The Money Store to Moss Codilis for use in generating the breach letters and to designate a contact person ("Operations Manager") to address "questions,

_____

[1] As the majority acknowledges, such notices are generally a first step in the debt collection process and are a prerequisite in virtually all residential mortgages to commencing any action to enforce lien rights.  *See* Maj. Op. at 10.

6

suggestions, or areas of concern" and to assist The Money Store in developing periodic training courses for The Money Store's own staff. Moss Codilis also agreed to indemnify The Money Store in connection with the breach letter program "for any losses incurred resulting from the violation of an existing federal or state statute and/or regulations."

The Money Store, in turn, committed in the Letter of Agreement to provide Moss Codilis "with access to books, records, databases, investor guidelines, and files necessary for the completion of contract duties." The Money Store reserved the right to "initially and from time to time review and approve sample forms of the breach letters . . . based on the format of the breach letter only." The Agreement memorializes the Money Store's objectives in connection with its arrangement with Moss Codilis:

1. Meet all federal, state, agency and investor requirements;
2. Reduce [The Money Store's] costs of handling defaulted loans;
3. Develop process improvements;
4. Reduce losses on defaulted loans;
5. Obtain training for current staff.

Neither party disputes that Moss Codilis, with The Money Store's assistance, drafted template breach letters to comply with applicable state and federal laws; that

7

Moss Codilis thereafter generated over 88,000 breach letters from 1997 through 2000, using information regarding defaulted loans provided by The Money Store; and that the firm had numerous follow-up communications with debtors and their lawyers, both orally and in writing.[2] It is further undisputed that Moss Codilis at all relevant times conducted business separately from The Money Store, had its own employees, acted under its own name, and represented many other clients in connection with debt collection services. The record additionally reflects, moreover, that when its breach letters on behalf of The Money Store proved ineffective at prompting debtors to pay monies owed, lawyers affiliated with Moss Codilis often became involved in subsequent legal proceedings on The Money Store's behalf.

## III.

Neither party disputes that Moss Codilis drafted, printed, and mailed letters informing the plaintiffs that they owed money to The Money Store and that they should promptly pay that money back. Nor does either party dispute that these

---

[2] Among other things, Moss Codilis provided debt verification information to debtors upon request, as well as information regarding the identity of original creditors, as it committed to do in the breach letters. As the majority acknowledges, Christina Nash, who supervised Moss Codilis's work for The Money Store, also testified that she communicated with debtors' bankruptcy counsel and with attorneys at The Money Store concerning both bankruptcy proceedings and the discharge of debts in bankruptcy. *See* Maj.Op. at 10-11.

8

letters provided Moss Codilis's contact information and that Moss Codilis had follow-up communications with some of the letters' recipients. Yet despite these undisputed facts, the majority holds that a reasonable fact finder could conclude that Moss Codilis was not collecting or attempting to collect a debt. This counterintuitive result is the product of a conflation of § 1692a(6), the FDCPA provision defining as debt collectors those creditors who employ a false name to deceive debtors that a third party is collecting their debt, and § 1692e(3), which renders liable those debt collectors who deceive debtors about the debt collector's involvement as an attorney. Only the former type of deception is relevant to the false name exception, and it is simply not present in this case.[3]

---

[3] The majority asserts that I am conflating the false name exception with the general definition of debt collector, *see* Maj. Op. at 41 n.18, but I am not. Moss Codilis is a debt collector for the purpose of the FDCPA's general definition, which provides (again) that a debt collector is "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The problem here is not whether Moss Codilis is a debt collector. The problem is that The Money Store cannot be liable for deceptively collecting its own debts using Moss Codilis's name by virtue of *Moss Codilis's* debt collection efforts—as the majority holds—without departing from the most obvious meaning of the FDCPA's false name exception. That exception holds a creditor liable only when "in the process of collecting his own debts," the creditor falsely "uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6). It does not provide for creditor liability for hiring a debt collector who deceives debtors about *its* involvement as an attorney.

According to the majority, § 1692a(6)'s false name exception applies when: "(1) the creditor is collecting its own debts; (2) the creditor 'uses' a name other than its own; and (3) the creditor's use of that name falsely indicates that a third person is 'collecting or attempting to collect' the debts that the creditor is collecting." Maj. Op. at 24. I take no issue with this test, which accurately reflects what the text of § 1692a(6) requires. My disagreement is rather with the majority's reformulation of it, and in particular regarding its third element: that the use of the third party's name "falsely indicates" that the third party "is 'collecting or attempting to collect' the debts that the creditor is collecting."

Despite its use of the term, the FDCPA never specifies what activities are sufficient to constitute "collecting or attempting to collect" a debt. Nor, as the majority observes, does the term easily lend itself to a precise definition. *See* Maj. Op. at 29-30. We need not delineate the outer boundaries of "collecting or attempting to collect" a debt, however, in order to conclude that the false name exception does not apply in this case. For while the FDCPA may not precisely define what does or does not constitute "debt collection," that does not affect our ability to determine on this record what is potentially misleading—what is potentially "false"—about the use of Moss Codilis's name in the letters sent to

10

plaintiffs. And *that,* as the very structure of the FDCPA establishes, simply does not encompass whether Moss Codilis was "collecting or attempting to collect" plaintiffs' debts.

As the majority notes, what is potentially deceptive about the letters sent to the plaintiffs is their implication that Moss Codilis attorneys had been retained *as attorneys* to collect the plaintiffs' debts when in reality Moss Codilis did little more than input plaintiffs' information into a mass-processed form letter. *See* Maj. Op. at 20 & n.6. This may violate the FDCPA provision prohibiting debt collectors from using any "false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e; *see Clomon v. Jackson*, 988 F.2d 1314, 1321 (2d Cir. 1993). And this deception (if it occurred) is attributable, at least in part, to the presence of Moss Codilis's name—clearly that of a law firm—on the letters.

But a debt collector's misrepresentation of its involvement in collecting a debt *as an attorney* is different from a creditor's misrepresentation of *its* involvement in collecting a debt *as a debt collector*. Section 1692e suggests as much, as it requires defendants to be "debt collectors" under the Act before they can be liable for misrepresenting their involvement as an attorney in the first place. *See* 15 U.S.C.

11

§ 1692e, e(3). Even if Moss Codilis's breach letters may have falsely suggested that it was collecting or attempting to collect plaintiffs' debts *as an attorney*, such suggestion equates in no way at all with the different proposition that Moss Codilis also falsely claimed that it was collecting or attempting to collect plaintiffs' debt. For as made evident by the very structure of the FDCPA, the question whether Moss Codilis was collecting or attempting to collect plaintiffs' debt is separate and apart from the question whether it was involved in that collection in a legal capacity.

Once this is established, it also becomes clear that Moss Codilis's breach letters did not in fact falsely indicate that Moss Codilis was collecting or attempting to collect plaintiffs' debts. For while the presence of Moss Codilis's name on the letters may have indicated a number of things, the record establishes that it could have *falsely* indicated only one thing: Moss Codilis's involvement in the collection as a law firm. And as explained above, collecting or attempting to collect a debt in a legal capacity is not the same as "collecting or attempting to collect a debt" generally. Consequently, no reasonable fact finder could conclude that the use of Moss Codilis's name falsely indicated that it was collecting or attempting to collect a debt as the third element of the false name exception requires.

That the use of Moss Codilis's name on the letters did not falsely indicate

anything other than its involvement as a law firm is proven through a simple hypothetical question: if Moss Codilis's name did *not* suggest that it was a law firm, what would have been deceptive or misleading about its presence in the letters? Put differently, what would Moss Codilis's name have indicated about its involvement in collecting plaintiffs' debt that was not true? That Moss Codilis drafted the letter? It did. That Moss Codilis mailed out the letter? It did that too. That Moss Codilis was an independent entity, distinct from The Money Store? It was.

Recognizing this difference between involvement as an attorney and involvement in "collecting a debt" also reveals the flaw in the majority's analysis. The majority, in determining whether Moss Codilis "collected or attempted to collect" a debt, does not attempt to define that term's exact meaning under the FDCPA. Rather, it notes that under this Circuit's holding in *Maguire v. Citicorp Retail Services, Inc.*, 147 F.3d 232 (2d Cir. 1998), if a third party sells its letterhead to a creditor who then mails the letters to its debtors—that is, flat-rating—the third party has not engaged in debt collection. *See* Maj. Op. at 31 (citing *Maguire*, 147 F.3d at 235). It then determines that "[m]erely changing the return address" from the creditor's to the third party's "does not alter the force of *Maguire* because it does not change whether the letter misleads consumers, which we have explained is the

13

statutory touchstone for all aspects of the FDCPA, including the false name exception." Maj. Op. at 32 (citing *Maguire*, 147 F.3d at 236).

What this analysis ignores is that the letter in *Maguire* and the letters in this case are deceptive for different reasons. In *Maguire,* the letters falsely suggested that their sender was someone other than the creditor; here, the letters may falsely suggest that the sender, Moss Codilis, was involved in collection *as an attorney*. The difference between this case and *Maguire*, therefore, is more than "merely changing the return address": it is changing the return address and *changing the name on the letterhead to that of a law firm.* As mentioned above, if Moss Codilis's name did not suggest that it was a law firm, then the use of its name in the breach letters would not falsely indicate anything—Moss Codilis did, after all, draft and mail the letters. In *Maguire*, meanwhile, even though the third party's name did not suggest that it was a law firm, its presence on the letters still suggested that a third party had sent them—which it had not—thus rendering the letters inherently deceptive.[4] All told,

---

[4] Specifically, and as the majority describes, the letters in *Maguire* were sent by and bore the letterhead of "Debtor Assistance," which was an in-house collection department for the creditor, Citigroup. *Maguire*, 147 F.3d at 234-35. We held that the false name exception applied because, even though Debtor Assistance sent the letters, a least sophisticated consumer could think that Debtor Assistance was an entity separate from Citigroup. *Id.* at 237-38. Thus, the use of the name "Debtor Assistance" was deceptive insofar as it suggested that the letter came from a third party unrelated to Citigroup. *Id.*

once the issue of Moss Codilis's role as an attorney is separated out, the distinction between this case and *Maguire* does not appear "hyper-technical," as the majority argues, but wholly logical.[5]

Further supporting a distinction between this case and *Maguire* is that the FDCPA draws the exact same distinction in § 1692j, the flat-rating provision. That section's language clearly anticipates that a flat-rater does not itself communicate with debtors. To the contrary, § 1692j states that a flat-rater "design[s], compile[s], and *furnish[es]*" deceptive forms knowing that they "[will] *be used*" to create the false belief that someone other than the creditor is participating in the collection of a debt. *Id.* § 1692j(a) (emphases added). Notably, a flat-rater does not "send" the forms to the debtor, nor is the flat-rater the one that actually "uses" the forms to deceive the debtor. This is all in addition, of course, to § 1692j's admonition that whoever's name is on the deceptive form must not also be participating in the debt collection. *Id.*

---

[5] The majority also provides the hypothetical that "The Money Store sent the letters in sealed, stamped envelopes to Moss Codilis with the note 'please mail.'" Maj. Op. at 31 n.11. I would concede that, because the presence of a third party's letterhead might suggest that the third party drafted the letter as well as sent it, the false name exception might apply in such a situation. Since, however, it is undisputed that Moss Codilis did draft the letters sent to the plaintiffs, we need not address this issue.

15

Given the lack of support in either our own decisions or the text of the FDCPA for the conclusion it reaches here, the majority understandably looks to the case law of other circuits. The cases it cites, however, are either inapposite or unpersuasive.[6] While the Seventh Circuit's opinion in *Nielsen v. Dickerson*, 307 F.3d 623 (7th Cir. 2002), supports the majority's approach to the false name exception, it also exemplifies the contradictory conclusions that courts reach by conflating § 1692a(6) with § 1692e(3). In *Nielsen*, the Seventh Circuit determined that the debt collection letter at issue was not really "from" Dickerson as an attorney, and that Dickerson was therefore liable under § 1692e(3); it also determined that the letter was actually "from" Household, the creditor, and that Household was therefore liable under § 1692a(6) for falsely implying third-party involvement. *Id.* at 638-39. In other words, the panel simultaneously held Dickerson liable as a debt collector and held

---

[6] Nor is the majority's citation of Federal Trade Commission ("FTC") interpretive guidance helpful. As an initial matter, the language that the majority cites is not interpreting § 1692a(6), but rather § 1692e(14), which prohibits acknowledged debt collectors from "[t]he use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization." *See* FTC, Statements of General Policy or Interpretation Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50,097, 50,107 (Dec. 13, 1988). And even if the FTC's standard did apply, it is not particularly helpful to either party, as it merely adds a new fuzzy standard—that of using a third party as a "conduit" for collection rather than directly involving the third party—that is as insufficiently defined as "*bona fide*" involvement in assessing creditor liability.

16

Household liable for falsely implying the involvement of a debt collector. I do not find this reasoning persuasive.

The Fifth Circuit's opinion in *Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232 (5th Cir. 1997), meanwhile, is wholly consistent with my reasoning and stands for the unremarkable proposition that a creditor employing a flat-rater may trigger the false-name exception. *Taylor* involved a creditor who, while attempting to collect debts itself, used a form letter created by a law firm and bearing that firm's letterhead and signature. *Id.* at 1235. Unlike Moss Codilis, the law firm had no involvement in the collection process other than furnishing the letterhead and form. This hence presented an obvious example of flat-rating. The creditor constituted a debt collector under 15 U.S.C. § 1692a(6) because it was using another's name, and was further liable under 15 U.S.C. § 1692e(3) because it falsely implied that its collection letter was from an attorney. Meanwhile, the law firm was liable under § 1692j for furnishing the form. *Taylor*, 103 F.3d at 1237.

The majority departs from this straightforward application of the FDCPA. It articulates its reformulated test for determining whether a creditor has used another's name so as deceptively to suggest this third party's involvement in collecting the creditor's debts as "whether the third party is making *bona fide*

17

attempts to collect the debts of the creditor or whether it is merely operating as a 'conduit' for a collection process that the creditor controls." Maj. Op. at 37. But this *"bona fide"* collection standard appears nowhere in the text of the FDCPA. And unless the majority intends it as simply the inverse of § 1692j's flat-rating standard—an implausible construction of § 1692j—the *"bona fide"* standard creates an odd liability gap within the FDCPA: parties like Moss Codilis may be too involved in collection to be flat-raters under § 1692j, but not involved enough to be "actually" collecting or attempting to collect the debts at issue.[7] In other words, under this *"bona fide"* standard, an actual debt collector like Moss Codilis can escape civil liability under the FDCPA by becoming *more* involved in deceptive collection

---

[7] The majority insists, in a footnote, that its *bona fide* debt collection standard *is* the inverse of the flat-rating standard—so that assuming The Money Store is liable pursuant to the false name exception, Moss Codilis's activities amounted to flat-rating. Maj. Op. at 36 n.16. But the majority is incorrect in arguing that this is anything but an implausible construction of § 1692j. For Moss Codilis did not "furnish [a] form" to The Money Store "knowing that such form would be used to create the false belief in a consumer that a person other than the creditor" was participating in The Money Store's debt collection "when, in fact such person" was "not so participating," as § 1692j requires. Instead, it is undisputed that Moss Codilis *participated in* The Money Store's debt collection efforts by, among other things, drafting template breach letters to comply with the laws of the applicable jurisdictions, printing and mailing breach notification letters, and responding to debtor calls requesting debt verification information or the identity of original creditors. This is a practice of mass mailing that we have in the past deemed an "economic necessity . . . in the debt collection industry." *Clomon*, 988 F.2d at 1321. With respect, the majority is obfuscating the meaning of debt collection *and* flat-rating for future courts.

18

practices.  Surely this was not Congress's intent.

It is by no means evident why we should interpret the FDCPA, contrary to the most obvious meaning of its terms, to provide such a safe harbor for potentially bad actors.  Nor is it evident why, after having previously noted the "economic necessity of mass mailing in the debt collection industry" and observing that such mailings "may sometimes be the only feasible means of contacting a large number of delinquent debtors," *Clomon*, 988 F.2d at 1321, we should subject to civil liability creditors seeking to outsource this function to a third party.  It is also not evident why courts, in the guise of interpreting the false name exception, should in effect discourage creditors—assumed to be less prone to abusive debt collection practices—from remaining involved in the operations of the debt collection agencies they hire, lest they be deemed themselves to be debt collectors subject to the FDCPA.

The approach announced today will prove vexing, I fear, as future courts struggle with determining whether a creditor, supposedly exempt from the FDCPA and despite always acting in its own name, is nevertheless subject to it merely for hiring a debt collector whose practices are deemed inadequate in some respect.[8]  The

---

[8] The majority claims this fear is unwarranted and arises out of a failure to consider its discussion of what the false name exception's "use" element requires.  Maj. Op. at 26 n.8.  With respect, I don't think so.  The majority asserts that its use element requires "that there

19

parameters of the false name exception, heretofore clear, will become unpredictable. Unless and until Congress deems the arrangements between creditors and commercial debt collection agencies to be sufficiently rife with abuse as to merit creditor liability under the FDCPA, courts have no business providing for such liability themselves through questionable interpretations of the false name exception. I respectfully dissent from the majority's judgment vacating the district court's grant of summary judgment to The Money Store on plaintiffs' FDCPA claim.

---

must be some active involvement in the misrepresentation by the creditor" and that the "relevant affirmative action" by The Money Store was "retaining Moss Codilis for the express purpose of sending breach letters that appeared to be attorney collection letters to its debtors." Maj. Op. at 26-27. In other words, the majority in its discussion of this element again conflates the deception of a creditor who collects its own debts while using a pseudonym or name of another with the different deception of a third-party debt collector who falsely claims to be acting as an attorney. This approach can only sow confusion into an otherwise straightforward FDCPA provision.

20